DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED STATES DEPARTMENT OF LABOR, Petitioner,

v.

POTOMAC ELECTRIC POWER COMPANY, Respondent.

No. 77–1959.

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1979.
Decided Sept. 28, 1979.

**1380**

Gilbert T. Renaut, Atty., Dept. of Labor, Washington, D. C., with whom Laurie M. Streeter, Associate Sol., Dept. of Labor, Washington, D. C., was on the brief, for petitioner.

Richard W. Turner, Washington, D. C., with whom Daniel V. S. McEvily, Washington, D. C., was on the brief, for respondent.

Also Cornelius S. Donoghue, Jr. and Harry L. Sheinfeld, Attys., Dept. of Labor, Washington, D. C., entered appearances for petitioner.

Before TAMM, LEVENTHAL and MacKINNON, Circuit Judges.

Opinion for the court PER CURIAM.

PER CURIAM:

Partially disabled workers are more likely than other workers to become totally disabled.[1] Workmen's Compensation laws, which require employers to compensate their employees who become permanently disabled, would therefore tend to discourage hiring of the handicapped.[2] Section 8(f) of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 908(f) (1977) is designed to neutralize this problem. It provides that when a partially disabled worker becomes totally disabled or dies as a result of a work-related incident, the employer will not be responsible for all compensation payments. After the first 104 weeks, the employer will be entitled to contribution from a "special fund" created from payments by employers. *See* 33 U.S.C. § 944 (1977). By reducing the risk an employer takes when he hires a partially disabled person, section 8(f) should "encourage the employment of handicapped workers." S.Rep.No.92–1125, 92d Cong., 2d Sess. 7 (1972).[3]

In this case, the family of an employee of Potomac Electric Power Company (PEPCO) was held to be entitled to compensation. The sole issue here is whether the employer is entitled to contribution from the special fund.

**I**

In 1957, Joseph Brannon began working for PEPCO. In 1962, while on the job, he received a severe electrical shock. He gradually recovered from most of the physical effects of the shock,[4] but psychological problems remained. Brannon became ex-

---

1. For example, a worker who loses sight in one eye would not normally become permanently disabled, but if that worker were already sightless in one eye, then his second injury would result in a total disability. *E. g. Lawson v. Suwannee Fruit Steamship Co.*, 336 U.S. 198, 202, 69 S.Ct. 503, 93 L.Ed. 611 (1949); 2 A. Larson, *The Law of Workmen's Compensation*, § 59.31 at 10–285 (1976). Similarly, a worker with a pre-existing back injury is more likely to become seriously disabled from a subsequent back injury than is a healthy worker. *E. g., C & P Telephone Co. v. Director, Office of Workers' Compensation Programs, United States Dept. of Labor*, 184 U.S.App.D.C. 18, 564 F.2d 503 (D.C.Cir. 1977).

2. The Court in *C & P Telephone, supra*, 184 U.S.App.D.C. at 27, 564 F.2d at 512, explained:
   The Act makes the employer liable for compensation. Hence, the employer risks increased liability when he hires or retains a partially disabled worker. By virtue of the contribution of the previous partial disability, such a worker injured on the job may suffer a resulting disability greater than a healthy worker would have suffered.

3. [I]t was the clear intent of Congress to encourage the employment and retention of handicapped workers—individuals having a previous impairment. . . . Were it not for the shifting of this increased compensation liability from the employer to the Special Fund under § 8(f), the Act would discourage employers from hiring and retaining disabled workers.
   *C & P Telephone, supra*, 184 U.S.App.D.C. at 27, 564 F.2d at 512.

4. After the accident Brannon filed a claim and was granted a 10% permanent partial disability. He received $7.73 per week until the time of his death. Decision and Order of Administrative Law Judge, August 2, 1976 [ALJ Decision] 3, (in J.A.).

tremely nervous. He was very afraid of being near "energized equipment," fearing that he would be killed, or that he would contribute to an accident in which others would be injured.

Brannon was placed under the care of a psychiatrist, but his psychological problems continued. In 1966 Brannon considered resigning from his job. PEPCO was aware of his problem and induced him to continue despite his fears by promising not to expose him to energized equipment.[5] Nevertheless, in the succeeding years, Brannon was occasionally exposed to energized equipment, causing him great concern.

PEPCO granted Brannon a "work release" for a month in 1971 due to "anxiety reaction."[6] Brannon was again off work for two months in early 1974, under the care of his psychiatrist, Dr. Kastner.[7] The psychiatrist recommended that Brannon change jobs because whenever he was "near high voltages, there [was] a significant and almost immediate recall of all the pain that was involved in the initial traumatic episode."[8] Brannon apparently discussed his doctor's letter with his supervisor at work and decided to stay with PEPCO. He was given a different assignment away from energized equipment.

Brannon appeared to be making progress in 1974. But on January 21, 1975, he left work early, returned home, and shot himself to death.

## II

Brannon's widow filed a claim for death benefits on behalf of herself and her two sons. 33 U.S.C. § 909 (applicable here by virtue of 36 D.C.Code § 501 (1973)). In support of her claim, Dr. Kastner testified that "the 1962 injury and the sequence of events that followed therefrom caused a mental disease or defect which was responsible for the decedent's impulse to take his own life. . . . According to the doctor, but for the 1962 accident and the progression of symptoms thereafter, the decedent would not have committed suicide."[9]

PEPCO took the position that Brannon's suicide was a willful act, unrelated to the 1962 accident.[10] Alternatively, PEPCO contended that if the suicide was related to the 1962 accident, it was precipitated by "additional psychic trauma during the course of his employment which aggravated his condition and contributed to, but was not the sole cause of his death."[11] Thus, PEPCO sought to show that if the suicide was compensable, PEPCO was entitled to contribution from the special fund.[12]

The ALJ found that the 1962 accident caused a mental disorder in Brannon which was "aggravated by the conditions of his employment for the respondent employer" and that together this led to his suicide.[13] Accordingly, the ALJ held that (1) Brannon's family was entitled to compensation, and (2) PEPCO was entitled to contribution from the special fund, pursuant to § 8(f).[14]

---

5. Benefits Review Board Decision, August 26, 1977, 2 (in J.A.).

6. ALJ Decision 4–5; Benefits Review Board Decision 3.

7. ALJ Decision 5; Benefits Review Board Decision 3.

8. ALJ Decision 5.

9. ALJ Decision 12. Two letters written by the decedent shortly before his death also corroborated Mrs. Brannon's claim. ALJ Decision 5–8.

10. 33 U.S.C. § 903(b) (1977) provides:
No compensation shall be payable if the injury was occasioned solely . . . by the willful intention of the employee to injure or kill himself . . . .

11. ALJ Decision 18.

12. PEPCO offered the depositions of two psychiatrists. Each testified that Dr. Kastner's theory was incorrect, but that if it were correct, the subsequent exposures aggravated Brannon's difficulties, and therefore contributed to his suicide. The ALJ credited Dr. Kastner's testimony over PEPCO's doctors because Kastner had treated Brannon over 250 times, whereas the other doctors had never even met him, and their testimony was based solely on his medical records. ALJ Decision 15.

13. ALJ Decision 20.

14. *Id.*

The Director appealed to the Benefits Review Board. The Board affirmed, stating: "The record . . . supports a finding that decedent's pre-existing disability from the 1962 injury was in turn aggravated by exposure to energized equipment, with his mental condition deteriorating because of such exposure, culminating in his suicide in 1975." [15] The Director then petitioned this court for review.

### III

■ C & P Telephone, supra, 184 U.S. App.D.C. at 29, 564 F.2d at 514, establishes that three criteria must be met in order for an employer to be eligible for contribution under § 8(f). First, the employee must have had a pre-existing, permanent partial disability. Second, this condition must have been manifest to the employer. Finally, the preexisting partial disability must have contributed to the seriousness of the employee's second injury. The Director acknowledges that "[1] Brannon's mental condition [2] became manifest during his employment with PEPCO and that [3] conditions of his subsequent continued employment with PEPCO aggravated his condition in such a way as to contribute to his suicide." [16] Thus, the Director concedes that all three of the criteria have been met.[17] Nevertheless the Director contends that PEPCO is not entitled to contribution from the special fund.

The Director's primary argument is that § 8(f) contribution is inappropriate in cases in which both the pre-existing disability and the second injury resulted from the same course of employment with the same employer.[18] The Director offers two reasons in support of its contention. First, the Director maintains that the legislative purpose underlying § 8(f) is inapplicable in such cases. § 8(f) is designed to encourage an employer to hire or retain an employee who that employer would otherwise be motivated to discharge or not hire because of the increased risk of workmen's compensation liability. The Director asserts that in the instant case PEPCO had no incentive to fire Brannon. On the contrary, PEPCO could not afford to fire him because, according to the Director, it would have been tantamount to an admission that Brannon was permanently totally disabled by the 1962 accident. Since Brannon would not have been fired in any event, the argument goes, the purpose of § 8(f) is not served by allowing PEPCO to receive contribution.

■ Assuming arguendo that we would be willing to ignore the plain language of the statute under such circumstances, the Director's argument collapses when its factual predicate is examined. The assertion that firing Brannon would have constituted an admission that he was permanently totally disabled is specious.

Aside from an unreported opinion [19] and an opinion that does not even mention the

15. Benefits Review Board Decision 4.

16. Director's Br. 25.

17. In 1977 C & P Telephone, supra, 184 U.S. App.D.C. at 29, 564 F.2d at 514, definitively rejected the argument that a mere aggravation of an earlier injury does not constitute a "second injury" for the purposes of § 8(f) contribution. The case involved a claim by an employee with a preexisting back injury for total disability benefits following an on-the-job aggravation of her back problem. The court held that the employer was entitled to contribution from the special fund:

The Director further argues that § 8(f) can never be applied in an aggravation case, contending that the subsection applies only when two unrelated injuries combine. The

legislative purpose, however, would be frustrated by such an artificial distinction.

18. The Director correctly observes that C & P Telephone, supra, is distinguishable from the instant case because there the claimant's first injury was not work-related.

19. Director, Office of Workers' Compensation Programs, U. S. Dept. of Labor v. Raber-Kief, Inc., 558 F.2d 1037 (9th Cir. 1977).

Ninth Circuit Rules provide that "[a] disposition which is not for publication shall not be regarded as precedent and shall not be cited to or by this court or any district court of the Ninth Circuit . . . ." 28 U.S.C.A., Rules, Ninth Circuit Rule 21(c) (1979 Pocket Part). The Director's brief failed to mention that Raber-Kief is unpublished.

issue,[20] the Director cites three sources: *American Stevedores, Inc. v. Salzano*, 538 F.2d 933, 936 (2d Cir. 1976); *Perini Corp. v. Heyde*, 306 F.Supp. 1321, 1325–26 (D.R.I. 1969); and 2 A. Larson, *The Law of Workmen's Compensation* § 57.61 at 10–133 (1975).[21] *American Stevedores* states the general rule that "once a disability is proven, the employer has the burden of showing opportunity for work." *American Stevedores* relied on *Perini*, in which the district court stated:

> The burden is on the employer to establish that an employee injured in the course of his employment who proves he is disabled from his regular employment has actual opportunities to obtain other work.

Quite clearly, neither of these cases holds that the firing of an injured employee is an admission that he is totally disabled. They merely establish that in general once the employee is discharged the burden is on the employer to show that he is not totally disabled.

■ The Director relies primarily on Larson's treatise on Workmen's Compensation. He cites Larson for the proposition that "[a]n employer who discharges an employee in its employ by reason of the resulting disability provides 'the strongest kind of evidence' that the employee is permanently totally disabled."[22] If the Director had read the succeeding pages in Larson's text, he would have seen that this presumption is wholly inapplicable here. Larson explained:

> Although a refusal by the employer to rehire the employee after the injury appears to put the employer in a very weak position to assert availability of suitable employment, there may be special circumstances in which this would not of itself conclude the issue. This is apt to happen, for example, in cases of allergies associated with this particular employer's plant. . . . If the claimant's medical impairment is so limited or specialized in nature that he is not obviously unemployable . . . it is not unreasonable to place the burden of proof on him to establish unavailability of work to a person in his circumstances, which normally would require a showing that he has made reasonable efforts to secure suitable employment.

2 A. Larson, *The Law of Workmen's Compensation* at 10–135–36, 138.[23]

■ Brannon's psychological problems made it difficult for him to work for PEPCO. But there is absolutely no reason to believe that those problems would have impaired his ability to work for almost anyone else. Under Larson's analysis (which we adopt), therefore, firing Brannon would not have been conclusive evidence of this total disability. It likely would have been a case of specialized impairment, on which Brannon would have had the burden of proving inability to obtain employment. In sum, the Director's assertion that the reasons for § 8(f) contribution was not applicable here, rests on an erroneous premise—that PEPCO's firing of Brannon would have been an admission of total disability as of 1962.

The second reason offered by the Director for his contention that § 8(f) contribution should not be awarded in cases in which both the first and second injury resulted from the same course of employment with the same employer is that to do so would encourage employers to injure their already disabled employees. The Director explains:

> Under the Board's decision, an employer whose workplace routinely causes the

---

**20.** *Offshore Food Service, Inc. v. Benefits Review Bd.*, 524 F.2d 967 (5th Cir. 1975) (per curiam).

**21.** Director's Br. 26.

**22.** *Id.*

**23.** *E. g. Alvarado v. Industrial Commission*, 115 Ariz.App. 113, 563 P.2d 912 (1977) (worker prevented by doctor's orders from working with specific chemicals held not permanently disabled although she could not continue her old job), *Chrysler Corp. v. Duff*, 314 A.2d 915, 917 (Del.Sup.Ct.1973); *Mastrogiovanni's Case*, 332 Mass. 228, 124 N.E.2d 246, 247 (1955) (employee with allergy to chemical at her old place of employment has "burden . . . to prove her claim for compensation.")

most serious disabling conditions susceptible to aggravation can shift most of its compensation liability to industry covered by the Act generally by the mere mechanism, potentially collusive, of luring employees who have developed such conditions arising out of and in the course of employment and are already entitled to compensation therefor back to work which they are "distinctly unqualified for medically" just long enough for them to aggravate their conditions slightly—even if the disabling conditions would ultimately have worsened as much merely from exposure to the conditions of life or from distinct aggravations *off* the job.[24]

The essential feature of this argument is the assumption that the employee would have been entitled to compensation for permanent, total disability even if there had been no second injury. Whatever the merit of this argument in other cases involving different facts, it has no force here. If the closing lines of the Director's explanation, quoted above, were an implicit assertion that Brannon would have become totally disabled or killed himself even if there had been no aggravating second injuries that assertion is pure speculation at best. Moreover, it is contrary to the factual findings of the ALJ and the Benefits Review Board[25] and these must stand in the absence of express contrary findings supported by substantial evidence. Taking the record as a whole, we do not find any substantial evidence that the possibility of § 8(f) contribution provided PEPCO with an incentive to aggravate Brannon's psychological problems.[26]

We take up the more likely possibility that the Director did not intend any finding as to PEPCO specifically, but intended a general rule for second injury from the same employer. It is not clear whether—in support of such a rule—he made a finding that there have been instances of abuse by employers, or a speculation that there might be such abuse, or both. This approach is argued to reflect administrative expertise, which the court must respect.

■ This court does respect administrative expertise, but its dominant function is to fulfill legislative intent and expectation. § 8(f) is intended to "encourage the employment and retention of handicapped workers . . . ." This court stressed in *C & P Telephone, supra,* that

In considering the purpose of the statute, there is *no* rational distinction between *employing* a handicapped individual and *retaining* an existing employee who develops a handicap.[27]

Taken to its logical conclusion, the Director's argument would lead to a bar against § 8(f) contribution whenever compensation for a retained, previously disabled employee is involved. Such a bar would discourage retention of handicapped employees and thus would frustrate the announced Congressional objective to aid handicapped employees in obtaining employment. If Congress had considered there was a problem of employer "incentive" to injure handicapped workers, it could have expressly prohibited contribution whenever retained employees are involved. That Congress did not do so militates against the Director's contention.

■ In Summary, we recognize that *C & P Telephone, supra,* can be distinguished from this case in that here both the preexisting disability and the second injury arose out of the same course of employment with the same employer. But we find that distinction an unpersuasive reason for denying PEPCO contribution. In both cases contribution serves the legislative purpose of encouraging the employer to retain a disabled employee. There is a possibility that, as the Director asserts, a rule permitting an employer to receive contribution from the special fund would provide an incentive for venal employers to retain and injure their handicapped employees. This possibility cannot defeat the claim of a particular em-

---

**24.** Director's Br. 28–29.

**25.** *See* pages ——–—— of 197 U.S.App.D.C., pages 1381–1382 of 607 F.2d.

**26.** The Director concedes that ⟩ PEPCO's conduct was "enlightened." Director's Br. 29.

**27.** 184 U.S.App.D.C. at 27, 564 F.2d at 512 n.8 (emphasis in original).

ployer like PEPCO in the absence of some evidence linking that employer to such a purpose. Nor can it stand as a general prophylactic rule barring all employers, without regard to individual motive or good will, for we are clear that Congress felt that it was important to ensure that disabled employees can keep their jobs, and we discern no legislative intent that this objective be discarded because of the possibility that a few Machiavellian employers would deliberately re-injure the handicapped.[28]

██  The Director makes one final argument. He contends that PEPCO ought to be precluded from obtaining contribution under § 8(f) because it failed to compensate Brannon for his pre-existing psychological disability. § 14(a) of the Longshoremen's Act, 33 U.S.C. § 914(a) (1970) provides:

> Compensation under this Act shall be paid periodically, promptly, and directly to the person entitled thereto, without an award, except where liability to pay compensation is controverted by the employer.

The Director suggests that it is "incongruous" to permit an employer to take advantage of a pre-existing disability (by allowing the employer to receive contribution from the special fund) when that employer never paid the compensation due the employee as a result of the pre-existing disability. While we acknowledge the appeal of the Director's contention, it has no application here. In order to be entitled to compensation, an employee must file a claim. 33 U.S.C. § 913(a). It does not appear from the record that Brannon ever sought compensation for his psychological injuries.[29] Under such circumstances, it would be unreasonable to hold that PEPCO's failure to pay compensation is a bar to its entitlement to contribution from the special fund under § 8(f).

### IV

██  The ALJ and the Benefits Review Board found that Brannon's suicide was the

product of his pre-existing psychological injury (sustained in the 1962 accident) and his subsequent exposures to energized equipment on the job (second injury). This conclusion is amply supported by the record, and its validity is conceded by the Director. It is well established that § 8(f) contribution is appropriate in such an "aggravation case." *C & P Telephone, supra*, 184 U.S. App.D.C. at 29, 564 F.2d at 514. Since the Director's reasons for denying contribution despite these facts are unpersuasive, the Benefits Review Board's decision is

*Affirmed.*

---

28.  We are not here confronted with a substantive rule, with a record supporting an administrative finding that most employers have responded with such motivation to employees who were injured in their service.

29.  Brannon did file a claim for his physical injuries, and was compensated. *See* n.4, *supra*.