645 F.2d 1053
 207 U.S.App.D.C. 128
 DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR, Petitioner,
v.
BRANDT AIRFLEX CORPORATION and U. S. Fire Insurance Company
and John F. Delinski, Respondents.
John F. DELINSKI, Petitioner,
v.
BRANDT AIRFLEX CORPORATION, Employer/Respondent,
and
U. S. Fire Insurance Company, Carrier/Respondent,
and
Director, Office of Workers' Compensation Programs, Respondent.
BRANDT AIRFLEX CORPORATION, Employer, and U. S. Fire
Insurance Company, Carrier, Petitioners,
v.
John F. DELINSKI, Claimant, Respondent
and
Director, Office of Workers' Compensation Programs, Respondent.
 Nos. 78-2309, 78-2314 and 78-2315.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 22, 1980.
Decided Feb. 26, 1981.
 
 Petitions for Review of Orders of the Benefits Review Board.
 Joshua T. Gillelan, Atty., Dept. of Labor, Washington, D. C., for Director, Office of Workers' Compensation Programs, Petitioner in No. 78-2309 and Respondent in Nos. 78-2314 and 78-2315. Cornelius S. Donoghue, Jr., Acting Associate Sol., and Mary A. Sheehan, Atty., Dept. of Labor, Washington, D. C., were on the brief for Petitioner in No. 78-2309 and Respondent in Nos. 78-2314 and 78-2315. Gilbert T. Renaut, Atty., Dept. of Labor, Washington, D. C., also entered an appearance for Director, Office of Workers' Compensation Programs, Petitioner in No. 78-2309 and Respondent in Nos. 78-2314 and 78-2315.
 James F. Green, Washington, D. C., with whom James A. Mannino, Washington, D. C., was on the brief, for Delinski, Petitioner in No. 78-2314 and Respondent in Nos. 78-2309 and 78-2315.
 Gerald Herz, Washington, D. C., with whom Jeffrey W. Ochsman, Rockville, Md., was on the brief, for Brandt Airflex Corp. and U. S. Fire Ins. Co., Respondents in No. 78-2309 and 78-2314 and Cross-Petitioners in No. 78-2315.
 Before ROBINSON, MacKINNON and MIKVA, Circuit Judges.
 Opinion for the Court filed by Circuit Judge MIKVA.
 MIKVA, Circuit Judge:
 
 
 1
 John F. Delinski (Delinski), now deceased,[1] was a sheet metal worker hired by Brandt Airflex Corporation (Brandt) in September 1974 to assist in the construction of an office building in Washington, D.C. On December 13, 1974, Delinski arrived at the job site and proceeded to climb the stairs leading to the ninth floor where he was working. The elevators had not yet been installed. After climbing about seven flights of stairs, he suffered what was later diagnosed as congestive heart failure. He was hospitalized for one week and was thereupon advised by his doctors not to resume his employment.
 
 
 2
 Subsequently, Delinski filed a claim under the Longshoremen's and Harbor Workers' Compensation Act, as amended, 33 U.S.C. §§ 901-950 (1976) (the Act).[2] Brandt and its insurance carrier, U.S. Fire Insurance Company, stipulated that Delinski suffered an injury on December 13, 1974, and that the parties were subject to the Act, but claimed that the injury was not related to Delinski's employment and that, in any event, liability was limited to 104 weeks of compensation pursuant to section 8(f) of the Act.[3] The Administrative Law Judge (ALJ) found against the employer and its insurance carrier on both of these defenses. On appeal to the Benefits Review Board of the Department of Labor, the ALJ was reversed on the issue of the applicability of section 8(f). The Director of the Office of Workers' Compensation Programs of the Department of Labor (Director), who has responsibility for administering the Special Fund from which payments must be made when section 8(f) applies, and Delinski himself petitioned for review of this portion of the Board's decision.[4] Brandt and its insurance carrier petitioned for review of the finding that Delinski suffered a compensable injury. We affirm the decision of the Board.
 
 I. THE WORK-RELATED NATURE OF THE INJURY
 
 3
 The Act authorizes payment of compensation for "accidental injury or death arising out of and in the course of employment." 33 U.S.C. § 902(2) (1976). After a formal hearing, the ALJ found that Delinski had suffered such a work-related injury. In keeping with section 21(b)(3) of the Act,[5] the Benefits Review Board affirmed the ALJ's findings of fact since they were supported by substantial evidence in the record considered as a whole. We agree with the Board's assessment of the sufficiency of the evidence.
 
 
 4
 The building under construction included four underground parking levels. The top three levels were already open to the public for parking at $2.50 or $3.00 per day, and the bottom level was available for use by the construction workers at $1.00 per day. Delinski parked his car on the bottom level at the commencement of his work day and was on his way to his workplace in the building when the injury occurred. Brandt argues that the injury preceded Delinski's arrival at his place of employment and therefore did not occur "in the course of" his employment or "aris(e) out of" it.[6] This is an attempt to invoke the so-called "going and coming rule," which generally bars compensation for injuries sustained off work premises by employees going to or coming from work. See Foster v. Massey, 407 F.2d 343, 345 (D.C.Cir. 1968), and cases cited therein. In support of its argument, Brandt cites the Supreme Court's decision in O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 71 S.Ct. 470, 95 L.Ed. 483 (1951). However, we read O'Leary as demonstrating that the going and coming rule is inapposite to the facts of this case.
 
 
 5
 In O'Leary, the Court found coverage under the Act when an employee drowned while attempting to rescue someone by swimming through a dangerous channel which was marked as forbidden for swimming. The employee had spent the afternoon at a recreational center maintained by his employer which was located near the shoreline. The Court held that coverage under the Act "is not confined by common-law conceptions of scope of employment.... All that is required is that the 'obligations or conditions' of employment create the 'zone of special danger' out of which the injury arose." 340 U.S. at 506-07, 71 S.Ct. at 471-72 (citations omitted); accord, Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Employees v. Adler, 340 F.2d 799, 801 (D.C.Cir. 1964).
 
 
 6
 In the instant case, Delinski was "obligated" to work on the ninth floor on the day of the injury and, because the elevators were not yet functional, had to climb the stairs to the ninth floor in order to get to work. Nine flights of stairs (plus four flights from the discount parking level) in the elevatorless building constituted the "zone of special danger" out of which Delinski's heart attack arose. It defies reason and the remedial nature of the Act to suggest that the employment premises here were limited to the discrete job site on the ninth floor and that the employer's liability was limited accordingly. See A. Larson, The Law of Workmen's Compensation § 15.41 (1978). See also O'Keeffe v. Smith, Hinchman & Grylls Assocs., 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965). Therefore, we are fully satisfied that the ALJ's finding that Delinski was on the employer's premises at the time of the heart attack and that the attack occurred "in the course of" Delinski's employment "has substantial roots in the evidence and is not forbidden by law." Cardillo v. Liberty Mut. Ins. Co., 330 U.S. 469, 478, 67 S.Ct. 801, 806, 91 L.Ed. 1028 (1947); accord, Evening Star Newspaper Co. v. Kemp, 533 F.2d 1224, 1226 (D.C.Cir. 1976).
 
 
 7
 Brandt also argues that Delinski's heart condition was preexisting and that it did not change permanently as a result of the episode in question i. e., Delinski's permanent, total disability did not "aris(e) out of" his employment with Brandt on December 13, 1974. The record before the ALJ weighs heavily against such a claim. The ALJ found that Delinski was only partially disabled before the 1974 incident in question. Although physicians detected Delinski's coronary artery disease as far back as 1971, he continued working thereafter in an extremely strenuous occupation. He was referred to as one of the better workers during this period and the record shows that he performed his duties fully until his heart attack. While it is true that his doctor originally suggested Delinski's retirement back in 1973, the same doctor approved his return to work.[7]
 
 
 8
 Although there was some conflicting testimony concerning the temporal effect of the December 13, 1974 trauma, there was ample evidence for the ALJ to conclude that Delinski became totally and permanently disabled on that date. It is the ALJ's province, as the trier of fact, to weigh contradictory evidence, judge the credibility of witnesses, and reach an ultimate conclusion as to the facts. Nardella v. Campbell Machine, Inc., 525 F.2d 46, 48-49 (9th Cir. 1975); Todd Shipyards Corp. v. Donovan, 300 F.2d 741 (5th Cir. 1962). And it is well settled that an employer is liable for the consequences of a work-related injury which aggravates a preexisting condition. E. g., J.V. Vozzolo, Inc. v. Britton, 377 F.2d 144, 147-48 (D.C.Cir. 1967) (preexisting coronary arteriosclerosis).
 
 
 9
 Moreover, the history of this statute makes clear its remedial purpose, and its implementation has always presumed that doubts would be resolved in favor of the claim and coverage.[8] Swinton v. J. Frank Kelly, Inc., 554 F.2d 1075, 1081 (D.C.Cir.), cert. denied, 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976); Evening Star Newspaper Co. v. Kemp, 533 F.2d 1224, 1227 (D.C.Cir. 1976). This court most recently reaffirmed the breadth of that presumption in Riley v. U.S. Industries, 627 F.2d 455 (D.C.Cir. 1980), noting that the strength of the presumption that an injury "aris(es) out of" employment is enhanced where it has been established that the injury occurred "in the course of" employment. Id. at 458; accord, Wheatley v. Adler, 407 F.2d 307, 312 (D.C.Cir. 1968) (en banc). In any event, the standard of judicial review precludes any serious dispute of the ALJ's findings, entrenched as they are by the Board's affirmance. Banks v. Chicago Grain Trimmers Ass'n, 390 U.S. 459, 467, 88 S.Ct. 1140, 1145, 20 L.Ed.2d 30 (1968); O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951). We are convinced that substantial evidence supports the findings that Delinski's injury arose out of and occurred in the course of his employment with Brandt and resulted in his permanent disability.
 
 II. THE LIMITATIONS OF SECTION 8(F)
 
 10
 The remaining issue is whether the Board's determination that Brandt's liability is limited by section 8(f) of the Act should be upheld. Section 8(f), set out in the margin below,[9] reflects an effort by Congress "to encourage the employment and retention of handicapped workers individuals having a previous impairment." C & P Telephone Co. v. Director, Office of Workers' Compensation Programs, 564 F.2d 503, 512 (D.C.Cir. 1977). Congress recognized that workers compensation laws may increase employers' reluctance to hire such individuals because of fears that a partially disabled person is likely to suffer an injury on the job, compounding his previous disability and saddling his employer with burdensome compensation costs. See id. at 511 (quoting legislative history). So Congress decided to limit the burden on employers by restricting their liability in these so-called "second injury" cases to a maximum of 104 weeks' compensation, with the remainder of the employee's coverage to be paid out of a special fund created under the Act.[10]
 
 
 11
 As the case law has developed under section 8(f), a distinction has been drawn between "latent" injuries and those "manifest" to the employer; an employer is only eligible for section 8(f) relief if the employee's preexisting disability was "manifest" to him.[11] See American Mutual Insurance Co. v. Jones, 426 F.2d 1263, 1267-68 (D.C.Cir. 1970). It is true that section 8(f) contains no language even suggesting that the employee's previous impairment must be known or manifest to the employer before the 104-week limitation can apply. But this exclusion of "latent" injuries in previous court decisions has been considered appropriate because the congressional intent was to prevent discrimination, and "if the previous disability had not been manifest, the employer would have had no reason to discriminate against the handicapped person in hiring or firing." C & P Telephone Co. v. Director, Office of Workers' Compensation Programs, 564 F.2d 503, 514 n. 10 (D.C.Cir. 1977). Courts have noted that too liberal an application of section 8(f) might give undeserving employers a windfall at the expense of the special fund. See, e. g., American Mutual Insurance Co. v. Jones, 426 F.2d 1263, 1267 (D.C.Cir. 1970).
 
 
 12
 Although some jurists have questioned the statutory basis for the manifestness doctrine, see Ridgely v. Ceres, Inc., 594 F.2d 1175, 1178-79 (8th Cir. 1979) (Ross, J., concurring), the doctrine is established by clear precedent in this circuit, and Congress has not acted to erase the judicial gloss.[12] In locating the proper place of the present factual situation within the framework of our precedents, however, we must remember that manifestness is a matter of degree, and we must not guard so zealously against windfalls that the explicit congressional intent to protect the handicapped worker is sacrificed to an auxiliary purpose elaborated by the courts.
 
 
 13
 The "manifest" injury standard does not require actual knowledge on the part of the employer. See Atlantic & Gulf Stevedores, Inc. v. Director, Office of Workers' Compensation Programs, 542 F.2d 602, 609 (3rd Cir. 1976); American Mutual Insurance Co. v. Jones, 426 F.2d 1263, 1267-28 (D.C.Cir. 1970). Potential for discrimination exists where information demonstrating the employee's prior injury is "available to (the employer) when the hiring occurs, should he decide to take notice of it." Dillingham Corp. v. Massey, 505 F.2d 1126, 1128 (9th Cir. 1974). The employee's disability need not be superficially apparent. Internal pathologies may be eligible for section 8(f) treatment, although "(w)hat is manifest to a physician is not necessarily manifest to a lay employer," id.
 
 
 14
 The Third Circuit recently reviewed the applicability of section 8(f) under circumstances similar to those present here, and concluded that sufficiently explicit medical records may make an employee's disability manifest, even if the employer does not make the effort to examine those records. See Director, Officer of Workers' Compensation Programs v. Universal Terminal & Stevedoring Corp., 575 F.2d 452 (3d Cir. 1978). The claimant in that case, De Nichilo, suffered a similar heart episode while operating a forklift. As here, De Nichilo had a history of arteriosclerotic heart disease unknown to the employer. In ruling that section 8(f) applied to limit the employer's liability, the court reasoned:
 
 
 15
 Heart disease is not as obviously manifest a disability as is the loss of a limb or an eye. Nevertheless, in many instances heart disease is objectively determinable and objectively determined. The record before the administrative law judge contains the evidence of De Nichilo's prior hospitalization for a possible myocardial infarction and the testimony of Dr. Edward S. Wally that De Nichilo suffered from a coronary heart disease. The administrative law judge relied upon this evidence of De Nichilo's abnormal heart condition to conclude that the degree of stress De Nichilo underwent on December 28, 1974, produced the attack he suffered on that date. Although the administrative law judge did not use the word manifest, he found that De Nichilo had pre-existing physical infirmities of heart disease and diabetes mellitus. These were readily discoverable by any employer who looked at De Nichilo's record. That record makes the disability manifest. No more is required for the purpose of assuring that only eligible employers receive the insurance coverage provided by § 8(f) of the Act.
 
 
 16
 575 F.2d at 456-57 (emphasis added). The court reversed the Benefits Review Board's denial of section 8(f) relief to the employer.
 
 
 17
 The Board relied heavily on the Third Circuit's analysis in considering Delinski's case. The ALJ had found that Delinski's disability was not manifest to Brandt, but the Board reversed, observing that the facts were "almost identical to those of DeNichilo":
 
 
 18
 Claimant was hired under a union hiring hall arrangement, and no physical examination was performed. He has a long history of high blood pressure, coronary artery disease and arteriosclerotic heart disease, as well as residuals of pneumonia, bronchitis and pleuritis. Records concerning diagnosis and treatment of these conditions were kept by claimant's union Pension Fund and Health and Welfare Fund, by the hospitals at which he was treated, and by at least one doctor. These records were introduced before the administrative law judge, and were relied upon by him in determining that the existing disability contributed to the permanent total disability caused by the congestive heart failure. Under DeNichilo, claimant's medical history was discoverable had employer "decide(d) to take notice of it." Dillingham.
 
 
 19
 9 B.R.B.S. at 211. Delinski's medical records could not be more explicit. Indeed, both the union's files and the files of Delinski's physician Dr. Pellegrini contain copies of a letter Dr. Pellegrini wrote in support of Delinski's application for a total disability pension in 1973. That letter states a "confirmed diagnosis of Diverticulitis, coronary artery disease, peptic ulcer and hypertension, essential," with blood pressure ranging "from 200/110 to 150/90 with medication." App. 292, 415. Certainly any employer inspecting these records would be immediately put on notice that future injuries would be likely to compound a preexisting disability if Delinski continued to labor as a sheet metal worker. If these records were available to Brandt, then the Third Circuit's reasoning in Universal Terminal compels the conclusion that Delinski's disability was manifest.
 
 
 20
 A substantial argument has been waged throughout this litigation, therefore, concerning the availability of Delinski's pre-hire medical records to Brandt. Testimony indicated that the union pension fund would be hesitant to permit an employer to inspect its files without a written release from the employee, and that industry practice did not involve medical examinations or requests that employees submit non-union medical records. But nothing in the collective bargaining agreement required that industry practice.[13]
 
 
 21
 The ALJ viewed it as "positively established that medical records relating to the Claimant's prior disability were not available to the Employer." App. 554. If the ALJ's statement is to be read as confirming an obstacle to the employer's access to, for example, the records of Dr. Pellegrini, then that finding is not supported by substantial evidence.[14] If the ALJ's statement refers only to the unavailability of the union's copies of Delinski's records, then the ALJ erred in viewing those particular copies as determinative on the question of manifestness.[15]
 
 
 22
 Although we consider Brandt's unimpeded access to Delinski's records through Delinski's consent dispositive, we observe that the Board's opinion properly indicates that the key is the availability of the information or knowledge that those records reflect, namely that Delinski had a serious heart condition when he was hired by Brandt. Acknowledging that the availability of the medical records themselves is a "factor to be weighed in determining the manifest-latent issue," the Board went on to reiterate that "the test requires only that information be available to the employer 'should he decide to take notice of it.' " 9 B.R.B.S. at 210. There were other ways in which Brandt could have discovered that Delinski was suffering from heart disease, though Brandt did not choose to pursue them.
 
 
 23
 In any event, the point is not that Brandt failed to find out about the preexisting disability, but rather that the medical records provided unambiguous, objective evidence that there was such a disability, and that that information would have been immediately discovered by Brandt had Brandt made an attempt to find it. That is sufficient to demonstrate that the information was "available to the employer 'should he decide to take notice of it.' " Brandt is not receiving a windfall by sloughing off part of its liability onto the special fund where there was no potential for discrimination.
 
 
 24
 Section 8(f) does not require us to penalize Brandt for the fact that it did not actually request Delinski's records or conduct a physical examination. Congress' purpose, to prevent a paradoxical worsening of the plight of handicapped workers by the compensation laws, is best served if an employer is not forced to conduct physical examinations and private investigations to acquaint himself with the existing disabilities of prospective or current employees. Even small employers, who cannot afford the expense of examining every applicant, would be encouraged to discriminate, perhaps by relying on vague suspicions raised by older or less robust workers. The question is not whether the employer has earned section 8(f) relief, but whether the probable impact on employees justifies granting it. We feel it would undermine the congressional purpose if we disqualified Brandt from section 8(f)'s coverage because of its failure to inquire into Delinski's profusely documented physical condition.
 
 
 25
 Nothing we have said is inconsistent with prior holdings of this court. In American Mutual Insurance Co. v. Jones, 426 F.2d 1263 (D.C.Cir. 1970), injuries to claimant's arm disqualified him for manual labor, and subsequent investigation revealed that his intelligence (which had not been affected by the accident) was too limited to enable him to obtain any other kind of employment. Recognizing that "the degree of mental retardation cannot be adequately gauged by intelligence quotient alone," the court denied section 8(f) coverage to the employer on the ground that "nothing in the record gives any indication that (the claimant), up to the time of his injuries, showed a sufficient degree of social maladaptation due to limited intelligence that his disability could be fairly classed as 'manifest.' " Id. at 1268 (footnote omitted). Here, in contrast, there is no dispute as to the existence or the unequivocal nature of the medical records evidencing Delinski's history of heart disease.
 
 
 26
 In Maurice P. Foley Co. v. Balderson, 569 F.2d 132 (D.C.Cir. 1977), cert. denied, 439 U.S. 818, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978), the ALJ had found that section 8(f) did not apply and the Board had affirmed, concluding that substantial evidence supported the ALJ's determination that the claimant's chronic pulmonary condition was not "manifest" when he was hired. The court agreed that substantial evidence supported the ALJ's identification of factors "which would tend to conceal the nature of Balderson's condition from his employer." Id. at 136. Balderson always put in a full day's work; his periods of absence from prior jobs were not glaring; and his medical records stated that he was "able to continue his occupation of a steamfitter" after a spell of hospitalization. Id. Here, the ALJ's decision that Delinski's impairment was not manifest was based solely on the "strenuous nature" of the work he was willing to perform and the supposed unavailability of the medical records. Those records were in no way misleading as Balderson's were; the Board reversed the ALJ because the medical records plainly stated Delinski's impairment.
 
 
 27
 We uphold the Board's decision. The evidence in this case clearly indicates that Delinski's ill health would have been immediately apparent to any employer who chose to take notice of it. Requesting medical records or information may require some slight effort, but the purpose of section 8(f) is not to reward employer diligence. Under the circumstances of this case, Delinski's disability was manifest enough to create a potential for the discrimination that the statute seeks to avoid. The decision of the Board is therefore
 
 
 28
 Affirmed.
 
 
 
 [1]
 Mr. Delinski died of a heart attack on April 19, 1979. Brief for Petitioner Delinski at 5. This case continues, however, because it concerns whether Delinski's employer is liable, and if so to what extent, for a workmen's compensation claim filed as the result of a heart attack suffered by Delinski in 1974. Unfortunately, due to the protracted time delays throughout the adjudication of the case, it was not finally resolved before Delinski's death
 
 
 [2]
 The Act is made applicable to this case by the District of Columbia Worker's Compensation Act, D.C.Code §§ 36-501, 36-502 (1973)
 
 
 [3]
 As this court has previously explained, section 8(f), quoted in note 9 nfra,
 provides that in any case in which an employee who has an "existing permanent partial disability" suffers an on-the-job injury which results in permanent total disability, the employer shall provide compensation payments to that employee for 104 weeks, after which the remainder of the compensation due to the employee shall be paid out of the Special Fund accumulated by payments from insurance carriers and self insurers (see 33 U.S.C. § 944 (1976)).
 Maurice P. Foley Co. v. Balderson, 569 F.2d 132, 134 (D.C.Cir. 1977), cert. denied, 439 U.S. 818, 99 S.Ct. 80, 58 L.Ed.2d 109 (1978); C & P Tel. Co. v. Director, Office of Workers' Compensation Programs, 564 F.2d 503, 510 (D.C.Cir. 1977).
 
 
 [4]
 Brandt filed motions to dismiss the petitions of Delinski and the Director, contending that both parties lacked standing under section 21(c) of the Act, 33 U.S.C. § 921(c) (1976) (limiting review to "(a)ny person adversely affected or aggrieved"), to raise the section 8(f) issue before this court. On July 26, 1979, a panel of this court denied Brandt's motions in a per curiam order. We will abide by that order as it is "the law of the case," see 1B Moore's Federal Practice P 0.404(1) & (10) (2d ed. 1974), and we perceive that it is not "plainly wrong" nor will it "work manifest injustice." Brown v. Gesellschaft Fur Drahtlose Telegraphie, 104 F.2d 227, 228 (D.C.Cir.), cert. denied, 307 U.S. 640, 59 S.Ct. 1033, 83 L.Ed. 1521 (1939); cf. Potomac Passengers Ass'n v. Chesapeake & Ohio Ry. Co., 520 F.2d 91, 95 n.22 (D.C.Cir. 1975)
 
 
 [5]
 Section 21(b)(3) provides:
 The Board shall be authorized to hear and determine appeals raising a substantial question of law or fact taken by any party in interest from decisions with respect to claims of employees under this chapter and the extensions thereof. The Board's orders shall be based upon the hearing record. The findings of fact in the decision under review by the Board shall be conclusive if supported by substantial evidence in the record considered as a whole. The payment of the amounts required by an award shall not be stayed pending final decision in any such proceeding unless ordered by the Board. No stay shall be issued unless irreparable injury would otherwise ensue to the employer or carrier.
 33 U.S.C. § 921(b)(3) (1976).
 
 
 [6]
 The Director asserts that under the Act's two-prong test "in the course of" referring to time, place and circumstances of the accident in relation to the employment; "arising out of" referring to a causal connection or relationship between the injury and the conditions of employment Brandt's failure to raise the "in the course of" issue before the Board precludes consideration of it here. Since we conclude that Brandt's argument is clearly lacking in merit, we need not decide whether it was properly preserved
 
 
 [7]
 Delinski followed through on his doctor's suggestion and applied for his pension. However, due to an ulcer problem which kept Delinski from doing sheet metal work in 1964 and 1965, he lacked sufficient consecutive calendar quarters of work to qualify for a pension from the Sheet Metal Workers Union Health and Welfare Plan. He therefore continued to perform sheet metal work with his doctor's approval
 
 
 [8]
 Section 20 of the Act provides in relevant part:
 In any proceeding for the enforcement of a claim for compensation under this chapter it shall be presumed, in the absence of substantial evidence to the contrary
 (a) That the claim comes within the provisions of this chapter.
 33 U.S.C. § 920 (1976).
 
 
 [9]
 Section 8(f) states:
 (f) Injury increasing disability:
 (1) In any case in which an employee having an existing permanent partial disability suffers injury, the employer shall provide compensation for such disability as is found to be attributable to that injury based upon the average weekly wages of the employee at the time of the injury. If following an injury falling within the provisions of subdivision (c)(1)-(20) of this section, the employee is totally and permanently disabled, and the disability is found not to be due solely to that injury, the employer shall provide compensation for the applicable prescribed period of weeks provided for in that section for the subsequent injury, or for one hundred and four weeks, whichever is the greater. In all other cases of total permanent disability or of death, found not to be due solely to that injury, of an employee having an existing permanent partial disability, the employer shall provide in addition to compensation under paragraphs (b) and (e) of this section, compensation payments or death benefits for one hundred and four weeks only. If following an injury falling within the provisions of subdivision (c)(1)-(20) of this section, the employee has a permanent partial disability and the disability is found not to be due solely to that injury, and such disability is materially and substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide compensation for the applicable period of weeks provided for in that section for the subsequent injury, or for one hundred and four weeks, whichever is the greater.
 In all other cases in which the employee has a permanent partial disability, found not to be due solely to that injury, and such disability is materially and substantially greater than that which would have resulted from the subsequent injury alone, the employer shall provide in addition to compensation under paragraphs (b) and (e) of this section, compensation for one hundred and four weeks only.
 (2) After cessation of the payments for the period of weeks provided for herein, the employee or his survivor entitled to benefits shall be paid the remainder of the compensation that would be due out of the special fund established in section 44.
 33 U.S.C. § 908(f) (1976).
 
 
 [10]
 The special fund was established in the U.S. Treasury by section 44 of the Act, 33 U.S.C. § 944 (1976), to be administered by the Secretary of Labor. Disbursements are made from the fund on the order of the Director, acting for the Secretary. A separate special fund is maintained under the District of Columbia Workmen's Compensation Act and is administered in the same way
 Pursuant to subsection (c)(2), the Secretary is required to estimate the probable expenses of the special fund for a coming calendar year and to require each insurance carrier or self-insurer that paid benefits during the previous calendar year to make a prorated payment in accordance with a formula in order to cover the anticipated expenses. See U.S. Dept. of Labor Longshore (LHWCA) Procedure Manual, Part 5 Special Fund (1978), reprinted in Brief for Respondent Director at App. B. This method of spreading the risk among all employers is intended to encourage the employment of partially disabled workers. H.R.Rep.No. 1441, 92d Cong., 2d Sess. 8 (1972), reprinted in (1972) U.S.Code Cong. & Ad.News 4698, 4706.
 
 
 [11]
 This court recently described the criteria for eligibility for contribution under section 8(f) as follows: "First, the employee must have had a preexisting, permanent partial disability. Second, this condition must have been manifest to the employer. Finally, the preexisting partial disability must have contributed to the seriousness of the employee's second injury." Director, Office of Workers' Compensation Programs v. Potomac Elec. Power Co., 607 F.2d 1378, 1382 (D.C.Cir. 1979). In the instant case, the parties are at odds over whether the second criterion was satisfied
 
 
 [12]
 Section 8(f) was amended by section 9 of the Longshoreman's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L.No.92-576, 86 Stat. 1251. At that time, Congress "reaffirmed the basic purpose of the (8(f)) Special Fund protecting previously impaired workers." C & P Telephone Co. v. Director, Office of Workers' Compensation Programs, 564 F.2d 503, 509 (D.C. Cir. 1977). While Congress took the opportunity to overturn other judicial doctrines in the longshoremen's compensation field, see Pub.L. No. 92-576, § 18, 86 Stat. 1251 (codified at 33 U.S.C. § 905 (1976)) (limiting doctrine of unseaworthiness); H.R. Rep. No. 1441, 92d Cong., 2d Sess. 4-8 (1972) reprinted in (1972) U.S.Code & Ad.News 4698, 4701-05, it did nothing to disturb the "manifest-latent" doctrine under section 8(f)
 
 
 [13]
 Arguments have been made that the collective bargaining agreement prohibited Brandt from asking sheet metal workers about their health. The ALJ, however, made no explicit finding concerning the agreement, and we find no provision to that effect among its terms. In fact, testimony of the union business agent suggests just the opposite:
 Q. All right, now, do you have any type of an understanding with an employer as to what information they are entitled to obtain from a union member?
 A. The only understanding that we have, the only requirement of our members when they go to work for an employer, is fill out a W-2 form.
 Q. Okay, and just to give the required information they complete a W-2 form
 A. That is correct.
 Q. with name, address, social security number.
 A. That is correct.
 Q. All right, now, this is that understanding is not a part of any collective bargaining agreement.
 A. No, it is not.
 App. 17. And the following colloquy came in response to a question as to whether a violation of the collective bargaining agreement would result if a new employee voluntarily furnished his medical history upon the employer's request:
 ... would he, the employer, be in breach of the collective bargaining agreement?
 A. Employee (sic ) would not be in violation of our agreement as such that we would have no recourse. But that would be strictly the employee, if he wanted to do it
 Q. His own volition
 A. That's true.
 Q. But the union would have no prohibition
 A. No.
 Q. on the employee volunteering information
 A. No.
 Q. if requested by an employer.
 A. That is correct.
 App. 27. The most that can be concluded from this evidence is that the collective bargaining agreement did not itself give the employer the right to request medical information, or forbid him to do so, but that the practice of the industry was not to request it, and there was an informal understanding that that practice would continue.
 
 
 [14]
 As we have observed, see note 5 supra, the Board is bound by the ALJ's findings unless they are not supported by substantial evidence. 33 U.S.C. § 921(b)(3) (1976). This court's review is governed by the same standard. O'Leary v. Brown-Pacific-Maxon, Inc., 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951). The record contains some evidence concerning the confidentiality of the union pension plan's medical files, App. 11-12, 23-24, but contains no similar discussion concerning hospital files or the files of Dr. Pellegrini. The union business agent testified only that the collective bargaining agreement did not require medical information at the time of hiring, App. 26-27, and that the union would not encourage employees to provide it, App. 18. See note 13 supra
 
 
 [15]
 As the text illustrates, we consider the ALJ's statement somewhat ambiguous. He might have meant only that no medical records were made available to the employer, i. e., delivered into Brandt's custody, or that the union's copies of the medical records were inaccessible to Brandt (either de facto or as a matter of deliberate union policy), or that all copies of Delinski's medical records were inaccessible to Brandt. The testimony adduced at the ALJ's hearing does not support the third interpretation, see note 14 supra, and we hold that under the circumstances of this case, the other forms of "unavailability" do not compel the conclusion that Delinski's condition was not manifest to Brandt