**AMERICAN MUTUAL INSURANCE COMPANY OF BOSTON and Rose Brothers Company, Appellants,**

v.

**Willie B. JONES, Appellee.**

**No. 22054.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 30, 1969.

Decided April 28, 1970.

---

11. See p. 4, supra.

Mr. Thomas J. Ahern, Jr., Washington, D. C., for appellants.

Mr. Gerald Herz, Washington, D. C., with whom Messrs. Philip J. Lesser and I. Irwin Bolotin, Washington, D. C., were on the brief, for appellee.

Professor Ralph S. Spritzer, Philadelphia, Pa. (See FN4), by invitation of this Court, filed a brief as amicus curiae.

Messrs. Morton Hollander and Leavenworth Colby, Attys., Dept. of Justice, by invitation of this Court, filed a brief for the Department of Labor as amicus curiae.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge, and WRIGHT, Circuit Judge.

BAZELON, Chief Judge:

Appellants, an employer and his insurance carrier, seek to reverse an order of the District Court which found, notwithstanding a contrary determination by

a Deputy Commissioner of the Department of Labor, that appellee was entitled to benefits for permanent total disability [1] under the Longshoremen's and Harbor Workers' Act.[2] Three questions are presented by the record. First, whether the Deputy Commissioner's finding that appellee was not permanently totally disabled was supported by sufficient evidence to make a contrary conclusion by the District Court improper. Second, whether appellee is barred from receiving compensation for total disability because the Act provides a scheduled award for his injury. Third, whether appellee's limited intelligence constitutes a "previous disability" within the meaning of § 8(f) of the Act,[3] so that compensation for permanent total disability should be paid not by the employer but rather by the Special Fund created by § 44 of the Act.[4]

### I.

Appellee is a 63-year-old man of limited intelligence [5] whose only past work has been as a laborer. In 1951, he twice fractured his right arm while working for appellant Rose Brothers as a roofer's helper. Because of these injuries, he lost the use of his right hand for all but the lightest work. He can lift less than seven pounds with the hand, and can barely use it to hold a pencil to write.

At the hearing before the Deputy Commissioner, a physician, Dr. Wenger, characterized appellee's injury as a "35 to 45 percent" disability of the hand. He stated that appellee could "probably function well in a suitable employment." Dr. Horlick, a clinical psychologist, testified that because of appellee's limited intelligence, he could not be trained for jobs that "would require a minimum of ability," and that he would be a "liability in any employment." A counsellor with the United States Employment Service testified that appellee had registered with them in 1958 [6] and that, as of the time of the hearing in 1963, they had been unable to find him employment. Nevertheless, apparently basing his conclusion upon Dr. Wenger's testimony alone, the Deputy Commissioner concluded "that the claimant's disability * * * was and is confined solely to the right upper extremity."

By its own terms, this finding indicates that the Deputy Commissioner misapprehended the controlling law. The Act makes clear that "disability" is an economic and not a medical concept.[7] "The degree of disability in any case cannot be measured by physical condition alone, but there must be taken into consideration the injured man's age, his industrial history, and the availability of that type of work which he can do." [8]

---

1. From 1951, the date of the injury, through 1957, the employer and carrier paid appellee a total of $11,000 in compensation, the maximum allowable for permanent partial disability under the law in force at the time of the accident. *See* Act of June 24, 1948, c. 623, § 5, 62 Stat. 603.

2. 33 U.S.C. §§ 901–950 (1964), made applicable to the District of Columbia by 36 D.C.Code § 501 (1967).

3. 33 U.S.C. § 908(f) (1964).

4. 33 U.S.C. § 944 (1964).
   We first raised this question on our own motion, subsequent to oral argument in the case, and it has been briefed by the parties. In addition, our task has been greatly aided by excellent briefs *amicus curiae* submitted at our request by the Department of Labor and by Ralph S. Spritzer, Esq., of Philadelphia.

5. A clinical psychologist, Dr. Horlick, testified that appellee's rating on the Wechsler-Bellvue Intelligence Scale was 69.

6. Appellee did not register until he had ceased receiving payments for permanent partial disability.

7. 33 U.S.C. § 902(10) (1964) provides:
   "Disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment.

8. Eastern S.S. Lines, Inc. v. Monahan, 110 F.2d 840, 842 (1st Cir. 1940). *Accord,* Quick v. Martin, 130 U.S.App.D.C. 83, 87, 397 F.2d 644, 648 (1968); Cunnyngham v. Donovan, 328 F.2d 694, 697 (5th Cir. 1964); John W. McGrath Corp. v. Hughes, 289 F.2d 403, 405 (2d Cir. 1961).

Even a relatively minor injury must lead to a finding of total disability if it prevents the employee from engaging in the only type of gainful employment for which he is qualified.[9]

■ Here, the evidence of economic disability is overwhelming. Even if the burden is on the claimant to show the unavailability of other employment,[10] appellee's unsuccessful search for work over a period of years, and the testimony of Dr. Horlick, are sufficient to meet that burden. Appellants cannot sustain the Deputy Commissioner's finding on the basis of Dr. Wenger's conclusion that appellee could "probably" perform "suitable employment." There must be some showing that such "suitable employment" is actually available.

## II.

■ Appellants suggest that, since § 8(c) of the Act[11] provides a specific award for loss of a hand, such an injury can never be the basis for an award of compensation for total disability. The suggestion is without merit. As § 8 (a)[12] makes clear, in certain enumerated cases permanent total disability shall be conclusively presumed, and "in *all* other cases permanent total disability shall be determined in accordance with the facts."[13] Where, as here, the facts show permanent total disability, claimants are not limited to the scheduled awards.[14]

## III.

■ Testimony at the hearing before the Deputy Commissioner indicated that appellee's injury would not have resulted in permanent total disability had his intelligence not been substantially below normal.[15] This raises the question whether appellee's mental deficiency should be considered a "previous disability" so as to bring into play the provisions of § 8(f) (1) of the Act:[16]

If an employee receives an injury which of itself would only cause permanent partial disability but which, combined with a previous disability, does in fact cause permanent total disability, the employer shall provide compensation only for the disability caused by the subsequent injury; *Provided, however,* That in addition to compensation for such permanent partial disability, and after cessation of the payments for the prescribed period of weeks, the employee shall be paid the remainder of the compensation that would be due for permanent total disability. Such compensation shall be paid out of the special fund established in [33 U.S.C. § 944 (1964)].

Not without some hesitation, we conclude that § 8(f) (1) should not apply in the circumstances of this case.

Section 8(f) (1), sometimes referred to as the "second injury provision," was included in the Act as a protection to both employers and employees. "It protects that employer who has hired, say,.

9. Conversely, a continuing injury that does not result in any loss of wage-earning capacity cannot be the foundation for a finding of disability. Owens v. Traynor, 274 F.Supp. 770 (D.Md.1966).

10. *Contra,* Army & Air Force Exchange Service v. Newman, 278 F.Supp. 865, 867 (W.D.La.1967).

11. 33 U.S.C. § 908(c) (1964).

12. *Id.* § 908(a).

13. *Id.*

14. *See* Cunnyngham v. Donovan, *supra* note 8; A. Larson, The Law of Workmen's Compensation § 58.20 (1968), and cases there cited.

15. The question of apportionment of appellee's claim was not raised below, and in consequence no specific findings were made on this issue either by the Deputy Commissioner or by the District Court. In view of the fact that resolution of this case has been long delayed, and the fact that the record contains no indication whatsoever that appellee's condition in 1951 could be shown to meet the test we find applicable if apportionment is to be ordered, we find a remand unnecessary. Grosso v. United States, 390 U.S. 62, 71–72, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968).

16. 33 U.S.C. § 908(f) (1) (1964).

a one-eyed worker who goes and loses his other eye and becomes a total disability. The employer without this sort of thing would have to pay total permanent disability compensation. Then, on the other hand, this also protects the worker with one eye from being denied employment on account of his being an extra risk." [17]

Neither the language nor the purpose of the Act would seem to support any distinction between physical and mental disability for the purpose of § 8(f) (1).[18] Likewise, it is immaterial whether the disability is the result of a previous work-connected injury, an injury not connected with employment,[19] a congenital defect,[20] or perhaps even a disability resulting from social and economic causes.[21] Nevertheless, § 8(f) (1) does not apply to every case of permanent total disability in which a present injury is not the sole cause of the disability.[22] It was not intended to provide a windfall to employ-

ers, nor to actively encourage employment of the handicapped. Its purpose was simply to remove that aspect of discrimination against the disabled which would otherwise be encouraged by the very statute intended to protect them.[23]

Any such discrimination, however, must rest upon knowledge of the characteristic upon which the discrimination is to be based. In consequence, courts have distinguished between "manifest" [24] and "latent" [25] conditions for purposes of apportioning claims between employers and special funds such as the present one. Although some jurisdictions make the question turn upon the employer's actual knowledge of the employee's condition,[26] such a test has obvious practical difficulties in application.[27] Practice under the Longshoremen's Act has followed the more general rule, and sought to define certain classes of disability as "manifest" or "latent" without regard to the

17. Testimony of John B. Andrews, Secretary of the American Association for Labor Legislation, in Hearings on S. 3170 Before the House Committee on the Judiciary, 69th Cong., 1st Sess. 208 (1926), cited in Lawson v. Suwannee S.S. Co., 336 U.S. 198, 202, 69 S.Ct. 503, 93 L.Ed. 611 (1949).

18. Similarly, compensation is regularly awarded for disability when the only injury received is a psychological one. E. g., American National Red Cross v. Hagen, 327 F.2d 559 (7th Cir. 1964) (acute schizophrenic reaction produced by purely mental stimuli) ; Jarka Corp. v. Hughes, 196 F.Supp. 442 (E.D.N.Y. 1961) (head injury produced personality disorder and other psychological reactions).

19. Lawson v. Suwannee S.S. Co., 336 U.S. 198, 69 S.Ct. 503, 93 L.Ed. 611 (1949).

20. See generally 2 A. Larson, The Law of Workmen's Compensation § 59.32 (1968) and cases cited.

21. Cf. Lawson v. Suwannee S.S. Co., supra note 19, at 204, 69 S.Ct., at 506: A distinction between a worker previously injured in industry and one handicapped by a cause outside of industry has no logical foundation if we accept the premise that the purpose of the fund is that of aid to the handicapped.

22. Cf. § 8(a) of the Act, 33 U.S.C. § 908 (a) (1964), which provides that certain enumerated injuries shall be conclusively presumed to result in permanent total disability, and that "[i]n all other cases permanent total disability shall be determined in accordance with the facts." It has never been suggested that § 8(f) (1) was intended to be coextensive with all cases of permanent total disability found under the quoted portion of § 8(a).

23. See Lawson v. Suwannee S.S. Co., supra note 19, at 203–204, 69 S.Ct. 503.

24. E. g., Subsequent Injuries Fund v. Industrial Accident Comm'n, 53 Cal.2d 392, 1 Cal.Rptr. 833, 348 P.2d 193 (1960) (preexisting schizophrenia found manifest) ; cf. State Subsequent Injuries Fund v. Industrial Accident Comm'n, 196 Cal. App.2d 10, 16 Cal.Rptr. 323 (1961) (mental deficiency) (by implication).

25. E. g., Boyd-Campbell Co. v. Shea, 254 F.Supp. 483 (S.D.Tex.1966) (congenital anomalies of spine) ; United States Fidelity & Guaranty Co. v. O'Keffe, 240 F. Supp. 813 (S.D.Fla.1962) (inadequate underlying personality).

26. For example, New York by judicial decision and Florida by statute. 2 A. Larson, supra note 21, at § 59.33, pp. 88.143–.144.

27. See id. at pp. 88.143–.154.

employer's actual knowledge of the employee's condition.[28]

Clearly, some degrees of mental retardation are so severe that they cannot fairly be characterized as other than "manifest."[29] The question is whether appellee's disability was of such degree during the time of his employment. On the present record, we cannot say that it was. As of 1963, his intelligence quotient on the Wechsler-Bellvue scale was measured as 69; according to any of the standard nomenclatures, this would place him at the borderline of mental retardation.[30] But even aside from all the problems regarding the accuracy of such tests,[31] the degree of mental retardation cannot be adequately gauged by intelligence quotient alone.[32] Its true measure is the extent to which, *because of* inadequately developed intelligence, an individual's ability to learn and to adapt to his environment is impaired. We need not here decide where the line should be drawn. It is sufficient for present purposes that nothing in the record gives any indication that appellee, up to the time of his injuries, showed a sufficient degree of social maladaption due to limited intelligence that his disability could be fairly classed as "manifest."

We are constrained to add a final word. It may well be true that the Congress which passed the Longshoremen's and Harbor Workers' Compensation Act in 1927 had no real expectation that mental disabilities would ever become significant in its operation. But by using general language in the statute, Congress indicated an intention not to fix compensable injuries forever into the molds that could be cast by the medical and behavioral sciences forty years ago. Perhaps to a greater extent than any similar group in our society, the mentally retarded are underemployed in terms of their capacity for useful and productive work.[33] We are aware of no information that would indicate to what, if any, extent this underemployment is due to the discrimination sought to be avoided by § 8(f)(1) of the Act, rather than to prejudice, fear, or discomfort.[34] Furthermore, if mental deficiency is to play a significant part in the administration of the special fund, it seems likely that Congress, after a careful investigation, could do a better job than the Labor Department and the courts in drawing a line between "manifest" and "latent" mental retardation. Finally, our dissenting brother suggests that the Act represents a social choice different from that which we see in it. We express no opinion whatsoever on the social and political merits of the many available options. We do suggest, however, that an examination of the Act in light of the vast developments in the social and behavioral sciences since 1926—an exami-

28. *See* cases cited note 25 *supra.*

29. For example, adults with an I.Q. under 20 will almost invariably need complete care and constant supervision if they are to survive. Department of Health, Education & Welfare, Mental Retardation, in Health, Education and Welfare Indicators, June 1962, at vi.

30. *Id.*; Seidenfeld, Mental Retardation: A Further Assessment of the Problem, Department of Health, Education & Welfare Rehabilitation Service Series No. 63–62, at 5 (1962).

31. *See generally* F. Redlich & D. Freedman, The Theory and Practice of Psychiatry 230–234 (1966); President's Panel on Mental Retardation, Report of the Task Force on Law 6 (1963). *See also* Hobson v. Hansen, 269 F.Supp. 401,

477–489 (D.D.C.1967), affirmed *sub nom.* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

32. Redlich & Freedman, *supra* note 31, at 655–657; President's Panel on Mental Retardation, *supra* note 31, at 4–7; Seidenfeld, *supra* note 30, at 6–9 and materials cited.

33. *See* President's Panel on Mental Retardation, A Proposed Program for National Action to Combat Mental Retardation 128–130 (1962); Roper Research Associates, Summary Report of a Study on the Problems of Rehabilitation for the Disabled 24 (undated pamphlet reproduced by the Department of Health, Education, and Welfare).

34. *See id.* 24–26.

nation that can be carried out in depth only by the Congress—would certainly be worthwhile.

Affirmed.

WILBUR K. MILLER, Senior Circuit Judge (dissenting):

On September 6, 1951, Willie B. Jones fell when a wheel barrow he was pushing overturned. He suffered an injury to his right wrist and hand. For temporary total disability and permanent partial disability, the employer and insurance carrier paid compensation in the total sum of $11,000, the limit of the Act. The last payment was made September 17, 1957.

On September 5, 1958, Jones filed a claim against his employer for additional benefits. He alleged that due to his physical impairment caused by the injury and other factors, including his limited skills and lack of education, he had been unable to obtain employment and so had had no earnings since September 17, 1957. He alleged that, therefore, as a result of the injury of September 6, 1951, he had suffered permanent total disability.

The Deputy Commissioner found there was no medical or other evidence that Jones had any disabling condition causally related to the injury of September 6, 1951, except that for which he had been fully compensated. He therefore rejected appellant's claim for additional compensation.

Jones sought review in the District Court and obtained summary judgment directing the Deputy Commissioner to award him compensation benefits for permanent total disability. Consequently the latter ordered the employer and insurance carrier to pay $19,355 for the period from September 18, 1957, to April 23, 1968, and thereafter to pay at the rate of $35.00 per week. They were also ordered to pay the reasonable cost of medical treatment and care required in the future. On appeal, my colleagues affirm. They do so on the theory that disability is an economic, not a medical, concept, and that the evidence of economic disability is "overwhelming." That may be, but there must also be some proof of causation; it is lacking here. I think the record as a whole supports the Deputy Commissioner's findings and his denial of the claim for additional compensation. That being true, the courts have no right to substitute their judgment for his.

Jones is barely above a moron in intelligence. He had several diseases and on February 6, 1961, sustained a fracture of his right shoulder in a fall on ice. The evidence showed that he is addicted to alcohol, has a police record, and made very little effort to get work. At the time of the hearing in the District Court he was receiving public assistance and had been receiving it for some time. I think he should continue to be a public charge. The cost of maintaining this unfortunate should be spread out among all the people, i. e., it should be borne by the government. It is wrong, in the circumstances here, to impose that cost upon only two members of the public—the employer and the insurance carrier, who have already discharged their legal liability.

I would reverse.