**TODD PACIFIC SHIPYARDS CORPORATION; Aetna Casualty and Surety Company, Petitioners,**

v.

**DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS; Annie Mayes, Respondents.**

**No. 89–70084.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 7, 1990.

Decided Sept. 10, 1990.

---

Russell A. Metz, Witherspoon, Kelley, Davenport & Toole, Seattle, Wash., for petitioners.

Samuel J. Oshinsky, U.S. Dept. of Labor, Washington, D.C., for respondents.

Before WRIGHT, REINHARDT and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We must determine whether the Benefits Review Board of the Department of Labor correctly interpreted and applied section 8(f) of the Longshore and Harbor Workers' Compensation Act, which provides an employer partial relief from liability for worker's compensation payments when certain conditions exist.

## I

On June 15, 1979, Annie Mayes, an employee of Todd Pacific Shipyards, injured her right knee during the course of employment. As a result of the injury, Mayes has suffered from a permanent disability which prevents her from returning to work at Todd Pacific. Assessments of Mayes's vocational capabilities revealed that she had no skills suitable for sedentary work which she was physically capable of performing and that Mayes had no realistic employment potential.

Mayes filed a claim for benefits against Todd Pacific under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "Act"). See 33 U.S.C. §§ 901–950 (1988). On November 16, 1984, an administrative law judge ("ALJ") issued a decision and order in which he found Mayes to be permanently and totally disabled from April 17, 1981 as a result of a combination of her right-knee condition and preexisting mental limitations. The ALJ

also granted relief to the employer/carrier (Todd Pacific and Aetna Casualty & Surety Co.) under section 8(f) of the LHWCA. See id. § 908(f). This relief limited the employer/carrier's liability to Mayes for permanent total disability payments to 104 weeks. After such time, the Special Fund established under 33 U.S.C. § 944 would assume responsibility for compensation payments.

The Director of the Office of Workers' Compensation Programs in the United States Department of Labor appealed from the ALJ's decision and order to the Benefits Review Board. The Director argued that the ALJ had erred in finding that Mayes's mental limitations constituted an existing "manifest" permanent partial disability under section 8(f).

The Benefits Review Board agreed with the Director and overturned the ALJ's award of section 8(f) relief. It held that the ALJ erred in "conclud[ing] that [Mayes's] pre-existing mental limitations ... were severe enough or far enough from the normal range to qualify as a mental impairment or disability sufficient to satisfy Section 8(f) requirements." Decision and Order at 2, OWCP No. 14–49387, BRB No. 84–2857 (Benefits Review Board, U.S. Dep't of Labor) (Dec. 28, 1988) [hereinafter "BRB Decision"]. The Board stated that "the evidence of record does not support the administrative law judge's finding of a pre-existing permanent partial disability." Id. at 3.

Todd Pacific and its insurance carrier, Aetna Casualty, timely petition for review of the Board's decision. We have jurisdiction under 33 U.S.C. § 921(c).[1]

## II

Section 8(f) of the Longshore and Harbor Workers' Compensation Act limits, in certain instances, the liability of an em-

---

1. In conducting our review, we must examine the Board's decision for errors of law and for adherence to the statutory standard governing the review of an ALJ's factual determinations. See Long v. Director, Office of Workers' Compensation Programs, 767 F.2d 1578, 1580 (9th Cir. 1985). That statutory standard is a requirement that the Board treat the ALJ's findings of fact as "conclusive if supported by substantial evidence in the record considered as a whole." 33 U.S.C. § 921(b)(3) (1988).

ployer for disability payments under the Act. Congress provided in relevant part:

In any case in which an employee having an existing permanent partial disability suffers injury, the employer shall provide compensation for such disability as is found to be attributable to that injury based upon the average weekly wages of the employee at the time of the injury.... In all other cases of total permanent disability or of death, found not to be due solely to that injury, of *an employee having an existing permanent partial disability, the employer shall provide* in addition to compensation under subsections (b) and (e) of this section, *compensation payments* or death benefits *for one hundred and four weeks only.*

33 U.S.C. § 908(f)(1) (1988) (emphases added). By so limiting an employer's liability, Congress wished to facilitate and encourage the hiring of partially disabled people. *See Lawson v. Suwannee Fruit & Steamship Co.*, 336 U.S. 198, 201–06, 69 S.Ct. 503, 504–07, 93 L.Ed. 611 (1949); *American Mut. Ins. Co. v. Jones*, 426 F.2d 1263, 1266–67 (D.C.Cir.1970). Congress sought to ensure that employers would not hesitate to hire a partially disabled person out of fear of increasing their liability in the event that a work-related injury combined with the pre-existing partial disability to result in a *total* disability. *See id.*

■ To be entitled to section 8(f) relief, the employer must establish (1) that the employee had an existing permanent partial disability prior to the employment injury; (2) that the disability was manifest to the employer prior to the employment injury; and (3) that the current disability is not due solely to the most recent injury. *Director, Office of Workers' Compensation Programs v. Cargill, Inc.*, 709 F.2d 616,

619 (9th Cir.1983) (en banc). Although the ALJ here concluded that Todd Pacific had met all three of these criteria, the Board disagreed, determining that Mayes was not suffering from a pre-existing permanent partial disability. In light of this conclusion, the Board noted that it "need not reach the issue of whether claimant's below average intelligence was manifest to employer." BRB Decision at 3 n. 2. We must determine, therefore, whether there was substantial evidence in the record to support the ALJ's conclusions (1) that Mayes's below-average intelligence was a pre-existing permanent partial disability and (2) that this pre-existing disability contributed to Mayes's ultimate level of disability.

### A

We turn first to the more important question, for purposes of this appeal, of whether Mayes's "mental limitations" were an "existing permanent partial disability" within the meaning of section 8(f). We divide this phrase into its constituent parts, examining first whether Mayes suffered from a disability, then whether any such disability was permanent and partial, and finally whether it pre-existed her knee injury at Todd Pacific.

### 1

■ The parties sharply contest whether Mayes suffered from a disability. The contest is exacerbated by the fact that Congress did not define "disability" for purposes of section 8(f). While Congress did set forth a general definition of "disability" for the LHWCA in 33 U.S.C. § 902(10), that definition does not apply to section 8(f) of the Act. *See Lawson*, 336 U.S. at 201, 69 S.Ct. at 504.[2]

---

**2.** Congress generally defined "disability" in the LHWCA as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." 33 U.S.C. § 902(10) (1988). It defined injury to mean in part "accidental injury or death arising out of and in the course of employment." *Id.* § 902(2). Thus, if one put together the two definitions along with the word "existing" in section 8(f), "existing disability" would mean "existing incapacity, because of accidental injury or death arising out of and in the course of employment, to earn the wages which the employee was receiving at the time of injury in the same or any other employment." The absurdity is obvious: how could a worker, before suffering the work-related injury, have an existing incapacity to earn his wages, especially an incapacity arising out of work-related injury or *death?*

The Director argues that "[t]he accepted definition of an 'existing permanent partial disability' under section 8(f)[ ] was set forth ... in the seminal case of *C & P Telephone v. Director, OWCP*, 564 F.2d 503 (D.C.Cir. 1977)." Respondent's Brief at 12. As quoted approvingly by us, the District of Columbia Circuit wrote:

To summarize, the term "disability" in new § 8(f) can be an economic disability under § 8(c)(21) or one of the scheduled losses specified in § 8(c)(1)–(20), but it is not limited to those cases alone. "Disability" under new § 8(f) is necessarily of sufficient breadth to encompass those cases, like that before us, wherein the *employee had such a serious physical disability in fact that a cautious employer would have been motivated to discharge the handicapped employee because of a greatly increased risk of employment-related accident and compensation liability.*

*C & P Tel. Co. v. Director, Office of Workers' Compensation Programs*, 564 F.2d 503, 513 (D.C.Cir.1977), *quoted in Director, Office of Workers' Compensation Programs v. Campbell Indus., Inc.*, 678 F.2d 836, 840 (9th Cir.1982), *cert. denied*, 459 U.S. 1104, 103 S.Ct. 726, 74 L.Ed.2d 951 (1983) (emphasis added by *Campbell Industries* Court). The Director errs in arguing that this so-called "cautious employer" test is a definition of "existing permanent partial disability." The D.C. Circuit did not thus define disability; in context, it merely gave an example.[3] "To define something is to state its necessary and sufficient condi-

tions." *United States v. Oren*, 893 F.2d 1057, 1062 n. 2 (9th Cir.1990). The *C & P Telephone* Court stated that "disability" was of "sufficient breadth" to encompass the "cautious employer" situation. *C & P Tel. Co.*, 564 F.2d at 513. It never indicated that this "cautious employer" situation was a necessary constituent of the term "disability." Despite the Director's urgings to the contrary, that "Todd has made no showing that Annie Mayes had such a serious disability in fact that it feared increased compensation liability when hiring or retaining her as a ship scaler," Respondent's Brief at 13, is not legally dispositive of the question of whether Mayes was suffering from a disability prior to her knee injury at work.

In reviewing the Benefit Review Board's determination that the ALJ erred in concluding that Mayes was suffering from a disability within the meaning of section 8(f), it is useful to contrast the statements of the ALJ and the Board. The ALJ in Mayes's case found in part as follows:

The prior existing mental limitations, however, were clearly manifest from her speech and other behavior, even though not documented by formal testing, were severe enough or far enough from the normal range to qualify as mental impairment or disability in the statutory sense of a physical or mental handicap which is likely to restrict opportunities for securing employment, and did in fact contribute to the ultimate level of disabil-

In *Lawson,* the Supreme Court rejected just such a construction of the LHWCA. Stating that this was not "the usual case" where "[s]tatutory definitions control the meaning of statutory words," the *Lawson* Court concluded that so to construe an earlier version of section 8(f) would "create obvious incongruities in the language." *Lawson,* 336 U.S. at 201, 69 S.Ct. at 504. Particularly, when combined with other parts of the LHWCA, it would mean that the employer would be liable for the total disability even though a main purpose of section 8(f) was to relieve some employers of such sole liability. Moreover, the Supreme Court concluded, such an interpretation would disserve the congressional purposes in the LHWCA of promoting the hiring of handicapped workers and seeking to assure potential employers that in certain in-

stances they would not be burdened with complete liability. The *Lawson* Court therefore concluded that "disability" was not "a term of art" in section 8(f) and could not be applied mechanically. *Id.* 336 U.S. at 206, 69 S.Ct. at 506.

Although amendments have slightly changed the words in section 8(f) since the Supreme Court's decision, the analysis in *Lawson* still governs. *See C & P Tel. Co. v. Director, Office of Workers' Compensation Programs,* 564 F.2d 503, 512 (D.C.Cir.1977); *Atlantic & Gulf Stevedores, Inc. v. Director, Office of Workers' Compensation Programs,* 542 F.2d 602, 606–08 (3d Cir.1976).

3. It is a fundamental logical principle that an example is not a definition (unless the example is the only thing capable of satisfying the terms of the definition).

ity. This condition therefore satisfies all the requirements of section 908(f).

Decision and Order Granting Benefits at 6, OWCP No. 14–49387, Case No. 84–LHC–1159 (Office of Administrative Law Judges, U.S. Dep't of Labor) (Nov. 16, 1984) [hereinafter "ALJ Decision"]. The Benefits Review Board overturned that decision with respect to section 8(f) relief, stating in part:

> However, the medical evidence of record fails to support the administrative law judge's finding. Although Dr. Mowatt, a clinical psychologist, found based on an I.Q. test that claimant was functioning intellectually within the borderline retarded range, Dr. Mowatt did not state whether claimant is retarded or whether she has a learning disability. Dr. Mowatt, in fact, noted that claimant's anxiety, lack of familiarity with the tests and her limited schooling undoubtedly had an effect on claimant's test results.

BRB Decision at 2–3.

The Director contends that the Board's decision was correct because "the ALJ never even considered [Mayes's] proven successes as a productive member of society." Respondent's Brief at 11. Rather, in the Director's view, the ALJ "simply noted that she looked and sounded retarded." *Id.* The Director points out that Mayes, despite limited schooling, reared nine children, worked as a cook in a restaurant, a maid in a hotel, and an aide in a nursing home, in addition to her years of employment at the shipyard.

To test the Director's analysis, we examine the evidence in the record. Dr. Marian Mowatt conducted a psychological evaluation of Mayes. Dr. Mowatt administered three tests: a Wechsler Adult Intelligence Scale, Form R test; a Bender Gestalt test; and a Wide Range Achievement Test (Reading). She reported, in part, as follows:

> [Mayes] worked hard at the tasks, and appeared to be doing her best. However, her anxiety, her lack of familiarity with the tests, and her limited schooling undoubtedly had an *effect on the results*. Intellectually Mrs. Mayes is functioning within the borderline retarded range, with a Full Scale I.Q. of 74, Verbal I.Q. of 78, and Performance I.Q. of 70.... [T]here are no areas where any vocationally useful strengths can be discerned.

> As for perceptual-motor skills, it is clear that Mrs. Mayes moves slowly, and that her ability to analyze spacial relations is poor. Her Bender Gestalt designs are crudely drawn. They do not show the usual indications of brain damage, but some of them show difficulties with curves and angles. These are on a par with the drawings of a five- or six-year old. She reads at the 4.3 grade level.

> I conclude that Mrs. Mayes would have great difficulty in any job requiring good small-muscle speed and coordination, or any job requiring good space perception. Even in a suitable job she will probably be slow, so that a non-competitive sheltered workshop situation may be the best placement for her.

Mowatt, Report of Psychological Evaluation (June 19, 1981) (Employer's Exhibit 11).

Janet Mott, a vocational counselor, conducted an extensive test of Mayes's ability to engage in a number of different activities. These included sorting of objects, assembly, whole body range of motion, and problem solving. Mott concluded that Mayes was unable to learn from her mistakes in these tests—unable to learn how to perform tasks even after repeated instruction. Mott observed in part:

> Extreme difficulty in grasping and remembering instructions. Failed to follow instructions....

> ....

> Difficulty with instructions—repeated after practice.

> ....

> I can't teach her to do this test and keep letters[,] numbers and answer columns correct.

> No matter how many times I correct her she always punches column # 1 in the answer sheet.

> (She is now punching ans. sheet at random.)

[Independent problem solving] [t]est invalid—could not learn to punch answers correctly.

Mott, Scoring Sheets, Valpar Component Work Samples (Nov. 7, 1983) (Claimant's Exhibit 8).

 Contrary to the Director's assertions, the ALJ based his decision on more than his own observation of Mayes. For instance, he discussed at length Dr. Mowatt's assessment of Mayes and credited it with particularity. That assessment was that Mayes is "borderline retarded." The ALJ also discussed in detail the testimony of two vocational counselors and gave detailed reasons as to why one's testimony was given more credence. Credibility determinations, of course, are within the ALJ's province, and we must give them great weight. See, e.g., Brawner v. Secretary of Health & Human Servs., 839 F.2d 432, 433 (9th Cir.1988) (per curiam).

The above evidence in the record *and* the ALJ's discussion of it belie the Director's assertion that "[t]he only stated basis for the ALJ's finding was his observation that the claimant, in essence, looked and sound-ed mentally retarded." Respondent's Brief at 7. The ALJ concluded, in effect, that Mayes's knee "injury would not have resulted in permanent total disability had [her] intelligence not been substantially lower than normal." *Jones*, 426 F.2d at 1266; *see also State Compensation Ins. Fund v. Director, Office of Workers' Compensation Programs*, 818 F.2d 1424, 1426 (9th Cir.1987) (mental retardation and learning disabilities can constitute pre-existing permanent partial disabilities within the meaning of section 8(f)); *Cononetz v. Pacific Fisherman, Inc.*, 11 Ben.Rev.Bd. Serv. (MB) 175, 178 (July 27, 1979) (noting that mental impairment can qualify as a section 8(f) disability). Substantial evidence in the record, considered as a whole, supports that conclusion. Mayes suffered only a knee injury while working for Todd Pacific; most people would not be precluded from working altogether by such an injury. Many, for example, could work as cashiers or in other similar sedentary positions. In Mayes's case, however, her mental limitations meant that such positions were not options.[4]

---

4. In one effort to determine whether a particular condition constituted a "permanent partial disability," we focused on whether the condition was "irrevocable." *See State Compensation Ins. Fund v. Director, Office of Workers' Compensation Programs*, 818 F.2d 1424, 1426 (9th Cir. 1987) (also referred to as *Watts*, after the name of claimant). We noted that "[m]ental retardation and learning disabilities are permanent, irrevocable reductions in individual capability," but concluded that illiteracy is not a permanent partial disability. In reaching this conclusion, we reasoned that, on the one hand, illiteracy stemming from a lack of education is not irrevocable or, to use a more apposite word, immutable. On the other hand, if illiteracy is due "to mental retardation or a learning disability," it is the retardation or the learning disability that is the permanent condition. *Id.*

This aspect of our analysis in *State Compensation* is not of particular help here, for there we were attempting to determine whether a condition was *permanent*, as in "existing *permanent* partial disability." 33 U.S.C. § 908(f)(1) (1988) (emphasis added). Irrevocability or immutability goes to whether something is permanent, not to whether it is a disability.

We are also unimpressed by the Director's attempt to rely on *American Mutual Insurance Co. v. Jones*, 426 F.2d 1263 (D.C.Cir.1970). *Jones*, it is true, concerned the question of whether someone with an intelligence quotient of 69 could be fairly said to have a manifest pre-existing permanent partial disability because of his mental limitations. The D.C. Circuit held that he could not, *but it based its decision on the fact that the condition in that instance was not "manifest."* The *Jones* Court could scarcely have been more explicit on the point:

Clearly, some degrees of mental retardation are so severe that they cannot fairly be characterized as other than "manifest." The question is whether appellee's disability was of such degree during the time of his employment. On the present record, we cannot say that it was.... It is sufficient for present purposes that nothing in the record gives any indication that appellee, up to the time of his injuries, showed a sufficient degree of social maladaption due to limited intelligence that his disability could be fairly classed as "manifest."

*Jones*, 426 F.2d at 1268 (footnote omitted). Because the question of whether Mayes's mental limitations were manifest to Todd Pacific before her work-related injury was not passed on by the Board and is therefore not before this court, *see supra* page 1429, this aspect of *Jones* is not relevant to this appeal. The relevant aspect of *Jones* supports our ruling. *See Jones*, 426 F.2d at 1267 ("Neither the language nor the purpose of the [LHWCA] would seem to support any

We conclude that substantial evidence in the record supports the ALJ's conclusion that Mayes was suffering from a disability within the meaning of section 8(f) and that the Board therefore erred in reversing the ALJ on that ground.

### 2

■ Substantial evidence also supports the ALJ's conclusion that Mayes's disability was permanent and partial. That it was partial is evident, for had it been total, Mayes would not have been able to work at Todd Pacific in the first instance. The disability was also permanent. Dr. Mowatt's assessment of Mayes, after testing, was that she was borderline retarded; similarly, Ms. Mott observed that Mayes had "[e]xtreme difficulty in grasping and remembering instructions" and that Mayes could not be taught how to take a particular test—"[n]o matter how many times I try to correct her." These assessments were "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" that Mayes was suffering from immutable mental limitations. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quotation omitted) (defining "substantial evidence").

### 3

Having concluded that substantial evidence in the record supports the ALJ's determination that Mayes's mental limitations constituted a permanent partial disability, we must next inquire whether the disability pre-existed her knee injury at work. The Director concedes that "the ALJ was correct in limiting the scope of his inquiry to evidence of [Mayes's] disability which existed prior to the date of [her] work-related injury." Respondent's Brief at 7 n. 3. The Director is therefore not seen to argue that Mayes's mental limitations were not "existing" within the meaning of section 8(f).

distinction between physical and mental disability for the purpose of § 8(f)(1).").

5. Our remand, of course, is to the Benefits Review Board; there is to be no remand to the ALJ. Todd Pacific has had its opportunity to

### B

The final question here is whether Mayes's pre-existing permanent partial disability contributed, along with her work-related knee injury, to her ultimate level of disability. The ALJ found that Mayes's mental limitations "did in fact contribute to the ultimate level of disability." ALJ Decision at 6. The Director does not dispute this conclusion.

### III

We grant the petition for review, vacate the decision and order of the Benefits Review Board which overturned the ALJ's award of section 8(f) relief to Todd Pacific, and remand this case to the Board. On remand, the Board should determine whether substantial evidence in the record supports the ALJ's conclusion that Mayes's pre-existing permanent partial disability was "manifest" to Todd Pacific.[5]

VACATED AND REMANDED.

introduce into the record substantial evidence that all requirements for section 8(f) relief are met in this matter.