Anthony PIETRUNTI, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS; United States Department of Labor; Thames Valley Steel and Liberty Mutual Insurance Company, Respondents.

No. 1675, Docket 96–4181.

United States Court of Appeals, Second Circuit.

Argued June 24, 1997.

Decided July 21, 1997.

Carolyn P. Kelly, Groton, CT (O'Brien, Shatner, Stuart, Kelly & Morris), for Claimant–Appellant.

Scott Roberts, New London, CT, for Respondents.

Before: FEINBERG and McLAUGHLIN, Circuit Judges, and LASKER, Senior District Judge.*

LASKER, Senior District Judge.

Anthony Pietrunti, claimant, appeals the decision of the Benefits Review Board

---

("BRB") affirming the decision of the Administrative Law Judge that he is only partially disabled and is not entitled to compensation for future psychiatric treatment under the Longshore and Harborworker's Compensation Act, 33 U.S.C. §§ 901–950 (1988). Pietrunti sustained an arm injury while employed as a welder at the Thames Valley Steel Corporation. In *Palombo v. Director, Office of Workers' Compensation Programs*, 937 F.2d 70 (2d Cir.1991), we set forth a burden-shifting scheme to be applied in analyzing claims under the LHWCA. The first two steps of that scheme are that "once a claimant demonstrates an inability to return to his job because of a work-related injury, he is considered totally disabled within the meaning of the LHWCA and the burden shifts to the employer to prove the availability of suitable alternative employment." *Id.* at 73. Pietrunti argues that under the standard set forth in *Palombo,* the employer failed to demonstrate the availability of suitable alternative employment and that accordingly the ALJ's decision that Pietrunti is only partially disabled is erroneous as a matter of law. We agree, and reverse and remand with instructions to award claimant benefits based on permanent and total disability, not inconsistent with this opinion.

## I.

In early 1993, Pietrunti filed a claim against Thames Valley Steel Corporation and Liberty Mutual Insurance Company. Pietrunti sought to recover for permanent total disability payments under section 8(a) of the Act, and for medical benefits for his psychiatric condition under section 7 of the Act, all due to his work-related arm injury.

A hearing was held before the ALJ on April 21, 1993 and the record established the following:

Beginning in 1987, Pietrunti worked as a welder for Thames Valley Steel Corporation. At the time, Pietrunti was 38 years old. Pietrunti attended school through the eighth grade in special education classes, but is not able to read or write. On March 22, 1990, he sustained an arm injury while assisting a coworker in guiding some I-beams. Though Pietrunti returned to work after the accident,

he continued only until May 9, 1990 because, according to Pietrunti, he was in constant pain and could not lift anything over 5 pounds.

Dr. William Cambridge, an orthopedist, examined Pietrunti on behalf of the Respondent Liberty Mutual Insurance Company for an evaluation of his right elbow, and concluded that Pietrunti remained totally disabled as of August 20, 1990. Dr. Theodore F. Scarlatos, an orthopedic surgeon, examined Pietrunti on June 7, 1991 and concluded that there was abnormal bone growth and ordered a regime of physical therapy. (App. at 252). In April 1992, Dr. S. Pearce Browning, another orthopedist, saw Pietrunti at the request of Liberty Mutual and concluded that, due to abnormal bone growth, Pietrunti suffered a 40% permanent impairment to his arm as a result of his injury and could not return to the type of work he had performed at Thames Valley Steel.

During the course of treatment for his arm, Pietrunti was treated for psychiatric problems, including depression, decreased attention and concentration, and compulsive eating. Pietrunti first began treatment on July 18, 1991 with Dr. Ruggiano, a board certified psychiatrist, as a referral from Dr. Scarlatos, one of Pietrunti's orthopedists. Dr. Ruggiano observed that Pietrunti had "a rigid and flat affect," spoke with "psychomotor slowing and a monotone cadence," and was "markedly depressed." (App. at 257). He diagnosed his condition as Adjustment Disorder with Depression and noted that Pietrunti "was having a difficult adjustment to his disability." Dr. Ruggiano prescribed and monitored Pietrunti's use of Thorazine.

In October 1991, Pietrunti was referred to Dr. Edward W. Aberger of the Institute for Behavioral Medicine by Dr. Scarlatos. Dr. Aberger's evaluation of Pietrunti noted that "Pietrunti is also experiencing substantial emotional distress associated with his chronic pain and disability." His conclusion was that Pietrunti was experiencing a "full-fledged chronic pain syndrome"; he recommended that Pietrunti be admitted to an inpatient pain program. (App. at 9).

On September 30, 1992, Dr. Ruggiano observed that Pietrunti's condition had become "much worse." His treatment notes indicate that Pietrunti was "pacing around the office" and had an "occasional suicide thought." (App. at 292). Dr. Ruggiano arranged for Pietrunti to be admitted to Our Lady of Providence Psychiatric Unit of St. Joseph Hospital that same day. Pietrunti was discharged on October 2, 1992 with a diagnosis of adjustment disorder with depression. (App. at 285). Based on the above, the ALJ found that Pietrunti sustained a work-related injury to his right arm, and that he was permanently partially disabled as a result of a 40% loss of use of the arm as of April 13, 1992, the date of Dr. Browning's report. This finding established Pietrunti's prima facie entitlement to total disability benefits under the standard set forth in *Palombo v. Director, Office of Workers' Compensation Programs*, 937 F.2d 70, 73 (2d Cir.1991), and shifted the burden to the employer to show the existence of alternative suitable employment. The employer responded by offering a Labor Market Survey. The ALJ found:

> Claimant has established that he could not return to the work of a welder. Respondent relies on upon the Labor Market Survey of Kent Moshier. According to Mr. Moshier, Dr. Cambridge had listed the following restrictions:
>
> > A maximum fifty pounds lifting; Seventy-five pounds pushing/pulling; Intermediate bending; Squatting; Driving one to three hours per day; Sitting one to three hours per day; Standing one to four hours per day.
>
> Dr. Cambridge never really comprehended the nature of Mr. Pietrunti's injury. He assumed that he was dealing with only the original trauma and had not seen later x-rays which might have revealed the bone overgrowth. Dr. Scarlatos stated in his report of April 30, 1992 that Mr. Pietrunti was totally disabled from his job as a steel worker. Dr. Scarlatos' restrictions were:
>
> > No lifting of anymore than twelve pounds to twenty pounds; No repetitive lifting.

Dr. Ruggiano describes a man who is nervous, unable to sleep, often out of control and agitated and placed him on Thorazine which affects his eyesight. In addition to the above, we know that Mr. Pietrunti can't read or write. This is not the picture of a man who is marketable in the labor market as Mr. Moshier suggests. Dr. Browning, who saw the claimant for the employer stated, "I think his psychiatric situation will prevent that (i.e. return to work). I recommend that you arrive at a full, final and stipulated settlement of claims." In his transferrable skills analysis, [ ] Mr. Moshier has assumed that Mr. Pietrunti could read blue prints and drawings. This is very questionable in light of his limited I.Q. and inability to read. This would also be true of the assumption that Mr. Pietrunti could use arithmetic and shop geometry to figure amounts of material needed and dimensions to be followed and costs of material. In this respect the entire general educational development area [of the transferrable job skills analysis] is inaccurate. In a category called temperament Mr. Moshier has concluded that Mr. Pietrunti can perform under stress. Mr. Moshier acknowledged that he did not take into account any psychiatric disability on Mr. Pietrunti's part. Mr. Moshier did not visit any of the assembly plants where he claimed jobs were available so he has no idea what the physical requirements of each of the jobs is, whether or not it would require sitting for more than one to three hours per day. He *assumed* that bench assembly work would allow the arm to be supported by leaning on the bench. He did not know that. Even so, it is clear from the descriptions of Mr. Pietrunti's injury that to lean on a bench would require pressure being put on the ulnar nerve area which is exactly where the pain and dysfunction is. Mr. Moshier did not ask specifically what is required in each of these jobs. He did not say that speed would be an essential factor in performing the assembler job.

When Mr. Moshier talked about the security guard category he acknowledged that there might be a great deal of sitting

involved. Mr. Moshier's only contact with the perspective employers was by phone and even at that he did not describe Mr. Pietrunti and what his capabilities were. Mr. Moshier stated that the most important thing about being a security guard was to have good vision. He apparently was not aware that Mr. Pietrunti's eyesight was affected by the Thorazine he was taking.

(Decision and Order of ALJ, App. at 16–17).

Though the ALJ made no formal finding that the employer met his burden of proving the availability of suitable alternative employment, he nevertheless concluded, after considering the above evidence, that Pietrunti was only partially disabled within the meaning of the Act.

Regarding Pietrunti's claim for medical benefits for stress related injury of March 22, 1990, the ALJ found:

I also determine that the alleged stress and psychiatric depression claimed by Mr. Pietrunti as a result of his being out of work is not supported by credible record medical evidence that the injury to his right arm on March 22, 1990 caused a resultant mental adjustment disorder. The claimant in statements to Edward Aberger, a psychiatrist, in October 1991, stated that his previous work environment at Thames Valley Steel Corp. was abusive and highly stressful and that his conflicts with a supervisor were responsible for chest pains experienced in 1989, that he feels bitter toward his previous employer and is convinced that he is entitled to a significant lump sum of settlement as retribution for his current physical and emotional problems.

I find that Claimant's stress symptoms are subjective and he merely reports these symptoms of sleep and appetite disturbance, decreased energy and interest and loss of ambition and feelings of worthlessness and the psychiatric examiners merely accept and conclude that these assertions are true. I find that the stress claim is unfounded and that the alleged stress is unrelated to the right arm injury sustained on March 22, 1990. I determine that future psychiatric treatment is not warranted and is not reimbursable under Section 7 of the Act.

Pursuant to these findings, the ALJ ordered respondent to pay temporary total disability benefits from May 9, 1990 through April 12, 1992, and permanent partial disability benefits for a 40% impairment for 124 weeks commencing on April 13. He also ordered the respondent to pay for all past care by Dr. Scarlatos and Dr. Ruggiano, but denied future psychiatric treatment. The Benefits Review Board in effect affirmed the ALJ's decision without opinion. See P.L. § 104–134, 110 Stat. 1321–218 (April 26, 1996).

Pietrunti advances two arguments on appeal: first, that because the employer failed to establish the availability of suitable alternative employment, the ALJ erred in finding that Pietrunti is not entitled to permanent total disability benefits; second, that the ALJ's finding that Pietrunti was not entitled to future psychiatric treatment because his psychiatric condition was not related to the work-related arm injury is not supported by substantial evidence in the record.

## II.

### A. Suitable Alternative Employment

Appellate review of an ALJ's determination of the extent of a claimant's disability is governed by the "substantial evidence" standard. *O'Keeffe v. Smith, Hinchman & Grylls Assoc., Inc.*, 380 U.S. 359, 85 S.Ct. 1012, 13 L.Ed.2d 895 (1965). *See Havas v. Bowen*, 804 F.2d 783, 785 (2d Cir.1985). If the decision of the ALJ is supported by substantial evidence, is not irrational, and is in accordance with the law, the decision must be affirmed. *Id.* As we have stated earlier, the scope of our review of an administrative decision is limited: "We will only consider whether the BRB made any errors of law and whether the ALJ's findings of fact, in light of the entire record, are supported by substantial evidence." *Sealand Terminals, Inc. v. Gasparic*, 7 F.3d 321, 323 (2nd Cir. 1993), citing, *Crawford v. Director, OWCP*, 932 F.2d 152, 154 (2d Cir.1991).

As indicated above, our decision in *Palombo v. Director, Office of Workers' Compensation Programs*, 937 F.2d 70, 73 (2d Cir.1991), set forth a three-step burden-shifting scheme to be applied in analyzing claims under the LHWCA. First, the claimant has the burden of proving the nature and extent of his disability and his inability to return to his former employment. *Id.* at 73. Because disability under the Act is an economic concept, the extent of disability cannot be measured by medical condition alone. *Nardella v. Campbell Mach. Inc.*, 525 F.2d 46, 49 (9th Cir.1975). Consideration must be given to the claimant's age, education and the availability of work he can perform after the injury. *American Mut. Ins. Co. of Boston v. Jones*, 426 F.2d 1263, 1265–66 (D.C.Cir.1970). Even a relatively minor injury may lead to a finding of total disability if it prevents the employee from engaging in the only type of gainful employment for which he is qualified. *Id.*

The burden then shifts to the employer to demonstrate the availability of suitable alternate employment or realistic job opportunities which the claimant is capable of performing and which he could secure if he diligently tried. *Palombo*, 937 F.2d at 73; *American Stevedores v. Salzano*, 538 F.2d 933, 935 (2d Cir.1976). To satisfy its burden, an employer "does not have to find an actual job offer for the claimant, but must merely establish the existence of jobs open in the claimant's community that he would compete for and realistically and likely secure." *Palombo*, 937 F.2d at 73. If the employer establishes the existence of such employment, the employee's disability is treated as partial, not total. *Id.* The claimant may rebut an employer's showing of alternative employment by demonstrating that he diligently tried but was unable to secure such employment. *Id.* "Absent any showing of [alternative work], the claimant, in economic terms, is 'totally disabled' within the meaning of the Act." *American Stevedores*, 538 F.2d at 935.

In the case at hand, the ALJ's opinion questioned whether the employer's Labor Market Survey, as prepared by Mr. Moshier, in fact set forth "suitable" employment for Pietrunti because, although the survey purported to consider Pietrunti's limitations, as enunciated by Dr. Cambridge, the ALJ concluded that, "Dr. Cambridge never really comprehended the nature of Mr. Pietrunti's injury." Moreover, the ALJ commented "this is not the picture of a man (Pietrunti) who is marketable in the labor market as Mr. Moshier suggests." The ALJ also criticized the Labor Market Survey because he found that it relied on several assumptions which failed to consider Pietrunti's actual capabilities including, for example: that "Mr. Moshier has assumed that Mr. Pietrunti could read blue prints and drawings [which was] very questionable in light of [Pietrunti's] limited I.Q. and inability to read"; that "Mr. Moshier concluded that Mr. Pietrunti can perform under stress [but] acknowledged that he did not take into account any psychiatric disability on Mr. Pietrunti's part."

Indeed, the ALJ questioned Mr. Moshier's conclusion that Pietrunti could perform either a security job or assembly work. As to security work, the ALJ found that although Mr. Moshier testified that the most important thing about being a security guard was good vision, Mr. Moshier "apparently was not aware that Mr. Pietrunti's eyesight was affected by the Thorazine he was taking." As to assembly jobs, the ALJ found that, although Mr. Moshier concluded that such jobs were available, "Mr. Moshier did not visit any of the assembly plants where he claimed jobs were available so he has no idea what the physical requirements of each of the jobs is." (App. at 17).

Despite the ALJ's clear rejection of the employer's proffered Labor Market Survey, he nonetheless concluded that Pietrunti was only partially disabled. However, as a matter of law, under the LHWCA, once Pietrunti established that he had sustained a work-related injury which prevented him from returning to his pre-injury employment—a proposition that is undisputed—he remained "totally" disabled until his employer establishes the availability of suitable alternative employment. *See, e.g., American Stevedores*, 538 F.2d at 935 ("since both doctors were in agreement that claimant suffered at least some disability by reason of his original compensable injury, and absent any showing by

the employer of even 'light or sedentary work' was available for the claimant to perform, the claim is necessarily within the coverage of the Act and the claimant, in economic terms, is 'totally disabled' ").

The ALJ himself challenged whether the two alternative jobs proposed by the employer—security and assembly work—were in fact "suitable alternative employment" because they were recommended without regard to Pietrunti's physical and mental limitations. Accordingly, because the employer failed to meet its burden of demonstrating the availability of suitable alternative employment, the ALJ was incorrect as a matter of law in finding that Pietrunti was partially disabled.

■■■■ The Respondents argue that the ALJ's finding that an investigator's report demonstrated that Pietrunti was capable of carrying trash barrels and a trunk "supports an inference that the claimant is capable of working by using both arms." (Respondents Br. at 10). However, under *Palombo,* once an employee is found not to be able to perform his original job, the burden shifts to the employer to establish the availability of alternative work. An employer cannot meet this burden simply by illustrating that the claimant can perform particular physical tasks. Rather, the employer must establish the availability of "jobs open in the claimant's community that he could realistically compete for and realistically secure." *Id.* at 73. While we are mindful that this burden on the employer is a "limited evidentiary one" which should not [change] the employer into an "employment agency for the claimant," the employer must, at a minimum, establish that its suggested employment is suitable for the claimant. Thus, although an employer is not required to engage in a job search for a claimant, it nonetheless must establish that its proffered alternative employment includes positions that a claimant can "realistically compete for." This requirement has particular relevance where, as here, the claimant's educational background, medical impairment and job qualifications are such that suitable job opportunities would be limited, at best. *See Air America, Inc. v. Director, Office of Workers' Compensation,* 597 F.2d 773, 779

(1st Cir.1979) ("courts have required proof of actual employment opportunities to defeat a total disability claim [where] claimant's medical impairment and job qualifications were such that his suitable job prospects would be [] limited"). In the case at hand, the ALJ's findings established that the employer's Labor Market Survey did not demonstrate that Pietrunti could in fact compete for any of the alternative positions. Accordingly, the ALJ's decision that Pietrunti was "partially disabled" was not based on substantial evidence and was incorrect as a matter of law.

## B. *Claimant's Psychiatric Condition*

■■■■ As a fact-finder, the ALJ has "the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence." *McLaughlin v. Secretary of Health, Ed. and Welfare,* 612 F.2d 701, 704 (2d Cir.1980)(quoting *Marcus v. Califano,* 615 F.2d 23, 27 (2d Cir.1979)). Credibility findings of an ALJ are entitled to great deference and therefore can be reversed only if they are "patently unreasonable." *Lennon v. Waterfront Transport,* 20 F.3d 658, 661 (5th Cir.1994). An ALJ is nonetheless bound by the expert opinion of a treating physician as to the existence of a disability "unless contradicted by substantial evidence to the contrary." *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990)(citing *Bastien v. Califano,* 572 F.2d 908, 912 (2d Cir.1978)). *See also Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir.1980)("opinions of treating physicians entitled to considerable weight"). Moreover, an ALJ "cannot arbitrarily substitute his own judgment for competent medical evidence." *McBrayer v. Secretary of Health and Human Services,* 712 F.2d 795, 798 (2d Cir. 1983).

The ALJ found that the Pietrunti's "stress symptoms [we]re subjective" and that Pietrunti "merely reports these symptoms of sleep and appetite disturbance [ ] and the psychiatric examiners merely accept and conclude that these assertions are true." (App. at 18). It was the ALJ's opinion that Pietrunti's reported mental health problems were not caused by the injury to his right arm, but were in fact related to earlier prob-

lems he experienced at Thames Valley Steel, an environment which Pietrunti himself characterized to Dr. Aberger, a psychiatrist, as "abusive and highly stressful." The ALJ further found that Pietrunti's testimony during the hearing "as to pain and discomfort he experiences in his right arm is not credible." *Id.* Overall, the ALJ concluded that Pietrunti was "not a credible witness."

The ALJ refused to credit the testimony of Dr. Ruggiano, Pietrunti's treating psychiatrist, because he found that his diagnosis simply accepted Pietrunti's asserted symptoms as true. This was the only reason given by the ALJ for rejecting Dr. Ruggiano's testimony. In our judgment such a reason for dismissing the findings of Dr. Ruggiano had no substantial evidentiary foundation.

On deposition, Dr. Ruggiano testified that he "observed that Mr. Pietrunti had a rigid posture and flat affect" and that from "his observation of Mr. Pietrunti over a two-year period, he believed that the problems that Mr. Pietrunti describes are genuine." (App. at 9). Dr. Ruggiano's treatment notes document Pietrunti's problems over a seventeen-month period from August 1991 until February 1993. Dr. Ruggiano's treatment notes report Pietrunti as agitated, hyperkinetic and tearful. In December 1991, Dr. Ruggiano wrote that Pietrunti had "totally regressed [;][h]e is sobbing and trembling and holding his arm by his side in gesture of paralysis and helplessness." (App. at 289). Dr. Ruggiano's notes for the period between December 1991 and September 1992 paint a similar picture of Pietrunti's depression. In September 1992, Dr. Ruggiano wrote that Pietrunti's condition had become "much worse." Dr. Ruggiano prescribed Thorazine and arranged to have him hospitalized at a psychiatric inpatient unit at St. Joseph Hospital that same day.

Dr. Ruggiano testified that it was his opinion that Pietrunti's arm injury "precipitated" his mental health problems after which "he then just fell apart and decompensated." (App. at 140). He stated that over the course of treatment he observed Pietrunti as a person who "can't face people," was "withdrawn," was "very limited in I.Q." and was

someone who "expects ridicule and [ ] very sensitive to it." (App. at 136–37). When cross-examined as to whether Pietrunti might be fabricating his symptoms, Dr. Ruggiano testified that it was his belief that even if it were true that Pietrunti were misrepresenting his physical symptoms, he would nevertheless conclude that Pietrunti was psychologically impaired but would change his diagnosis to "major depression" or "somatic form disorder."

Dr. Ruggiano's opinion of Pietrunti was supported by several other doctors. To begin, the doctor who evaluated Pietrunti at the inpatient psychiatric unit at St. Joseph Hospital concluded that Pietrunti "is still depressed and needs to be hospitalized." In addition, Dr. Edward W. Aberger of the Institute for Behavioral Medicine who evaluated Pietrunti on October 10, 1991, reported that Pietrunti's MMPI test results demonstrated a level of acute disturbance. His conclusion was that Pietrunti was experiencing a "full-fledged chronic pain syndrome." (App. at 9). Dr. Aberger noted that Pietrunti was "experiencing substantial emotional distress associated with his chronic pain and disability." (App. at 267). He further reported that Pietrunti's "pain problem has led to his increased dependence upon his wife, but has also been associated with increased marital arguments." (App. at 268). Dr. Aberger recommended that Pietrunti be admitted to an inpatient rehabilitation program.

Given the uncontroverted and unanimous evidence of Pietrunti's treating physicians, the ALJ's decision is somewhat suspect. The opinion of Dr. Ruggiano was entitled to great weight, as Pietrunti's treating physician. Contrary to the ALJ's finding, Dr. Ruggiano's diagnosis of Pietrunti was based on numerous evaluations, as well as a course of treatment for several prescriptive medications, including Thorazine. The ALJ appeared to be of two minds regarding the testimony of Dr. Ruggiano: for purposes of reviewing the employer's Labor Market Survey, the ALJ credited Dr. Ruggiano's testimony, commenting that "Dr. Ruggiano describes a man who is nervous, unable to sleep, often out of control and agitated and placed him on Thorazine ... this is not the

**1044**

picture of a man who is marketable in the labor market." Dr. Ruggiano's same findings, however, were rejected as mere restatements of Pietrunti's complaints for purposes of reviewing his mental health claim. Such a wavering estimate of Dr. Ruggiano's credibility may have led the ALJ to the puzzling conclusion that Dr. Ruggiano should be paid for Pietrunti's prior psychiatric treatment but not for future treatment.

We conclude that the ALJ substituted his own medical judgment of Pietrunti for that of the uncontradicted medical record. The ALJ merely overrode the medical opinions of Dr. Ruggiano and Dr. Aberger, each of whom concluded that Pietrunti was experiencing some form of an adjustment disorder as a result of his work-related injury, with his own finding that Pietrunti's symptoms were subjective and not credible. This determination not only ignored the testimony of several doctor-witnesses and almost two years of medical records documenting Pietrunti's illness, but it also failed to consider the most obvious indicator of Pietrunti's condition: his continued treatment on Thorazine, a powerful anti-depressant. Indeed, the ALJ's summary dismissal of the relevance of Pietrunti's having been medicated for depression since August 1991 calls into question his finding that Pietrunti's symptoms were merely "subjective." As the Seventh Circuit recently noted in *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir.1995), "[s]evere depression is not the blues. It is a mental health illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it."

The findings of the ALJ are reversed and the case is remanded for calculation of permanent total disability benefits, not inconsistent with this opinion.